# CASES

# FIRST DISTRICT

## DURING THE YEAR 1910.

---

Nash-Wright Company, Appellant, v. Daniel C. Wright, Appellee.

## Gen. No. 14,771.

1. CONTRACTS—*what illegal option.* The illegal contract for an option the so-called "option contract" which the legislature of this State has branded with illegality irrespective of the intent of the parties is one wherein A for a consideration gives B an option binding upon A, under which B has the right, as he may please to buy or not to buy from A within a specified time, a certain quantity of grain.

2. CONTRACTS—*what essential to make illegal as gambling in nature.* To make contracts for the purchase and sale of grain gambling in nature and illegal there must have been a mutual gambling intent; an intent to settle on differences, which must have existed at the time the contracts were made; a subsequent settlement on differences is only evidence of the prior intent; and so, too, the fact that no grain is actually received by a purchaser, or that prior to the time for the receipt thereof, he sells an equal quantity through the same broker and is paid the profit or pays the loss does not of itself compel the conclusion that the transaction contemplated a mere gambling on differences and was therefore illegal.

3. CONTRACTS—*when cannot be enforced notwithstanding absence of mutual intent to gamble.* A party who makes a contract with a gambling intent cannot enforce it even though such gambling intent is not participated in by the other party to the transaction. This is not because the contract is in itself illegal (mutual illegal intent is necessary for this) but because it is against a sound public policy to

permit one who has entered into a transaction with an illegal intent to recover thereon.

4. CONTRACTS—*what does not render illegal.* The law does not prohibit a man from entering into a contract for the purchase of property to be delivered to him in the future or from ordering an agent to enter into such a contract even though he may expect under certain contingencies to sell his rights before maturity and to take his profit or suffer his loss. Such a transaction is legitimate business speculation.

5. CONTRACTS—*when indemnities in grain valid.* If an insurable interest exists contracts of indemnity in grain are valid.

6 CONTRACTS—*when indemnities in grain invalid.* If no actual interest in grain exists which bona fide it is sought to insure against on the rise and fall of the market, contracts of so-called indemnity are mere options and illegal under the Criminal Code.

7. ASSUMPSIT—*recovery upon account stated.* If any part of the consideration entering into an account stated is illegal, there can be no recovery of any part of the claim under the count of account stated.

Assumpsit. Appeal from the Municipal Court of Chicago; the Hon. MANCHA BRUGGEMEYER, Judge, presiding. Heard in the Branch Appellant Court at the October term, 1908. Affirmed. Opinion filed June 3, 1910.

HARVEY STRICKLER and FYFFE & ADCOCK, for appellant.

BARNES & MAGOON, for appellee.

MR. JUSTICE MACK delivered the opinion of the court.

Appellant brought suit to recover a balance due it on an account stated and on a promissory note. Defendant pleaded the general issue, illegality, want of consideration and a set-off. Under the common counts defendant claimed by way of set-off damages for breach of an alleged contract to give defendant brokerage work under which he would earn at least $2,000 annually for two years and an account stated showing moneys due him. The jury returned a verdict for defendant. As defendant's claim on the account stated, irrespective of the brokerage claim, exceeded plaintiff's demand, it is clear that the verdict of the jury was based not on an allowance of any of the claims of either side, but on the rejection of all of them.

Appellant seeks a reversal on the grounds that the verdict

is against the weight of the evidence and that the court erred in admitting and excluding evidence and in giving and refusing certain instructions.

The facts briefly stated are as follows: Appellant, a corporation, and appellee were members of the Board of Trade of Chicago. Appellant was, but appellee was not, a member of the Board of Trade Clearing House. Appellee made numerous contracts personally with the various other members of the Board in the trading pits on the floor of the Board during the session of the Board and in the manner in which business is transacted there. When appellee had made a contract for the purchase or sale of grain he would place a memorandum of the contract upon what are called trading cards. The memoranda were always brief and simply indicated the amount sold, the month in which delivery must be made, the price and the name of the other party to the purchase or sale. The card was headed by the name of appellant, and each card was dated. At the close of the day's business on the Board, appellee would turn the cards so made and the contracts so entered into by him over to appellant, and the trades were cleared for the appellee through the appellant; i. e., it assumed entire responsibility for all trades entered into originally by the appellee, and turned over by him to it. The other party to the contract would place upon his card the name of appellant, the Nash-Wright Company.

Appellant, after the receipt of trading cards from appellee, would enter the various contracts thereby indicated upon the books and would send to appellee what were called confirmations. Thereupon appellant would assume entire charge of the trades or contracts so originated and there was evidence introduced tending to show that at times the appellant would receive and pay for grain delivered on contracts so originated by appellee, or would deliver grain and receive pay for the same from the other parties to such contracts. Appellee had upon the books of the appellant company a ledger account showing the regular ledger statement of the amounts due him or owing from him from time to time, and monthly statements, being transcripts of this monthly ac-

count, were rendered by appellant. These monthly statements, however, did not include any statement of open trades then being carried by appellant for appellee.

Appellee testified as to his intention not to deliver any grain contracted for by him or to receive any grain, and to settle all of his trades on the market differences. He further testified that he made numerous contracts for the purchase or sale of grain and that he subsequently closed these contracts out before the time for the delivery of the grain, the subject-matter of the contract, and settled the contracts in all instances by the difference in the market prices at the date of the entering into of the contract and at the date of the closing out of the contract. The process by which a contract of this kind was closed out was that appellee, having theretofore contracted for so many thousand bushels of grain at the market price, deliverable under the rules of the Board of Trade at any time during the month in which the grain was to be delivered, would, at some subsequent time, at his own convenience and choice, go upon the Board of Trade floor and make a contract for the sale of grain, deliverable by him under his contract in the same month in which the first grain was to be delivered. Both these contracts would be assumed by the appellant, Nash-Wright Company.

The appellee testified that he instructed Nash-Wright Company not to receive or deliver grain on his account. This statement is specifically denied by the various members of the corporation to whom Wright said he gave such instructions. The evidence is undisputed that some grain was delivered to the house of Nash-Wright Company on trades originated by Wright.

Appellee lived at Varna, Illinois, but spent most of his time in Chicago for several years prior to the suit. He was a farm owner. His dealings had been continuous and had assumed very large proportions, amounting to millions of bushels, both through the firm which preceded appellant's incorporation and through appellant.

A dispute arose between the appellant and the appellee in the fall of 1905 as to the condition of their respective ac-

counts. Thereupon the appellant sued the appellee for $30,000 in the Circuit Court of Kankakee county. This suit was settled by the payment of $15,000 to the Nash-Wright Company by the appellee. Then their former relations were renewed and the appellee again commenced trading upon the Chicago Board of Trade in the same manner as before through the appellant. This trading continued as before until the fall of 1906, when, on August 2 of that year, as appellee claims, the appellant company, becoming pressed for ready means, and cramped for the lack of banking accommodations, applied to the appellee to give to the appellant the appellee's note for $10,000, that it might use the note as collateral to strengthen its credit at the bank. This note was given at that time and is the note sued on in this case. At that time, appellee had a balance due him from appellant on closed deals, but there were open deals which appellant claims would if then closed have shown appellee indebted to appellant. Appellant claims the note to have been given on general account and not at all for accommodation. The note was credited as of August 7 in the appellee's account on the appellant's books. On September 29, 1906, the appellant's indebtedness to the appellee, as shown by its statement rendered to the appellee as of that day, amounted to $25,146.70, excluding, however, the open trades. The transactions ended in May, 1907, at which time appellant rendered appellee an account showing nearly $20,000 in addition to the $10,000 note to be due appellant from appellee. Later the account dated July 31, 1907, showing the balance to be $20,091.18 was given to appellee. While it is true appellee denies having received these statements, the evidence, in our judgment, clearly sustains the appellant on this point.

While the trial court seemed to consider evidence that the note was given for accommodation to have been admissible under the general issue, we are of the opinion that as the special plea to the count on the note sets up not only the defense of illegality but also, though informally, the defense of want of consideration, the evidence of accommodation was, in any event, admissible under this special plea. But as to this

defense, the evidence clearly preponderates in favor of appellant. Appellee's version of the transaction, unsupported either by witnesses or by any of the surrounding circumstances, is directly contradicted by several witnesses for appellant.

The set-off claimed by appellee was properly rejected by the jury. The monthly statement rendered in September, 1906, is clearly shown to have been only a transcript of the ledger account on closed deals, and while an admission of the indebtedness on these deals, it is not an account stated, in the light of the proof that there were many deals still open on which, if then closed, the balance would have been reduced or on the other side. Evidence of the true state of the accounts at the time of the rendition of this earlier statement should have been received in support of the defense to the set-off. Inasmuch, however, as the jury rejected defendant's claim the errors in relation thereto afford no ground for reversal.

As to the claim for brokerage, not only was appellee's unsupported statement directly contradicted by several witnesses, but it was inconsistent with the written memorandum of settlement made at the time the Kankakee suit was disposed of, as a part of which settlement appellee claimed he was to receive brokerage work thereafter. The memorandum contains no reference to any such agreement.

The main controversy, however, between the parties turns upon the alleged illegality of the transactions and the appellant's knowledge thereof.

The transactions of appellee were of two kinds: 1st: contracts with third persons or in some instances with appellant itself, to buy or to sell grain for future delivery; and 2nd: so-called ups and downs or indemnities.

We shall consider these separately. As to the first class, which were made in the pit in the manner hereinabove stated, appellee contends that these purchases and sales were all option agreements and therefore, irrespective of intent, illegal. But, as appears by the evidence, the word "option" is used in two different senses. It is used among the mem-

bers of the Board of Trade usually coupled with the name of the month in which grain is deliverable, as a trade name, and when so used, the sole option in the matter is the option which the seller has to deliver the grain purchased at any time during such specific month. Contracts contemplating actual delivery in the future, in which the only option feature is an option to specify on which particular day of a named month delivery must be made and received, are in no sense contracts for an option and are illegal only if both parties intend that the actual contract shall not represent their real agreement; if, despite provision for an obligatory future delivery, the parties intend that there shall be no such obligation, but only a settlement on differences in market values.

The illegal contract for an option, the so-called "option contract" which the legislature has branded with illegality, irrespective of the intent of the parties, is one wherein A for a consideration gives B an option, binding upon A, under which B has the right as he may please, to buy or not to buy from or to sell or not to sell to A within a specified time, a certain quantity of grain. Such contracts are by our law illegal.

The appellee's testimony implies that his contracts of the first class were illegal options, but if the explanations given of the use of this word and the specific testimony in the record as to the performance of the contract, the actual deliveries made under such contracts and the general method of doing business, be considered, there can be no question but that the contracts of future purchase or sale of grain, the first class, here in question were not contracts to give an option to sell or buy within the meaning of the statute.

To make such contracts of the first class illegal there must have been a mutual gambling intent—an intent to settle on differences, which must have existed at the time the contracts were made; a subsequent settlement on differences is only evidence of the prior intent. And so too the fact that no grain is actually received by a purchaser, or that prior to the time for the receipt thereof, he sells an equal quantity through the same broker and is paid the profit or pays the

loss, does not of itself compel the conclusion that the transaction contemplated a mere gambling on differences and was therefore illegal.

There is no evidence in this record of the intention of the third parties,—the other parties to the contracts of appellee, assumed by appellant,—to justify a finding that both parties intended to settle on differences only, and these contracts are therefore not in themselves illegal. They would have been enforceable against appellant, who stood in appellee's place as to the other parties. It does not, however, follow that Wright could have enforced them; in fact the law is clearly settled that the gambling intent on his part, even though not participated in by the other side, would prevent him from suing on the contract. This is not because the contract is in itself illegal; mutual illegal intent is necessary for this; but because it is against a sound public policy to permit one who has entered into transactions with an illegal intent, to recover thereon.

In Higgins v. McCrea, 116 U. S. 671, 685–6, the court says:

"If the defendant had withdrawn his counterclaim and docketed it as a separate suit against the plaintiffs, as permitted to do by the code, it needs no discussion to show that his action must have failed. His rights are not changed by the fact that the two causes go on *pari passu,* that are tried at the same time. We do not see on what ground a party who says in his pleading that the money which he seeks to recover was paid out for the accomplishment of a purpose made an offense by the law, and who testifies and insists to the end of his suit that the contract on which he advanced his money was illegal, criminal and void, can recover it back in a court whose duty it is to give effect to the law which the party admits he intended to violate.

"In the present case the plaintiffs alleged and insisted that their transactions with the defendant were carried on with no unlawful purpose. On the other hand, the defendant alleged and insisted that in the same transaction he intended to violate the law. We see no reason why in such a case the plaintiffs might not, if they had not cancelled the contracts,

recover the money paid by them for the defendant, while at the same time the defendant could not recover the money advanced to the plaintiffs for what he intended to be an unlawful purpose.

"In Holman v. Johnson, Cowper, 341, 343, it was said by Lord Mansfield that 'the objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this *ex dolo malo non oritur actio*. No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiffs' own stating, or otherwise, the cause of action appear to arise *ex turpi causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for when both are *equally* in fault *potior est conditio defendentis.'*

"If, therefore, the defendant intended to embark his money in an illegal and criminal venture, we do not see how this case is helped by the fact that the purpose of the plaintiffs was to invest the money so advanced in what they understood to be a lawful and innocent transaction.

"The paragraphs of the charge of the court excepted to amounted in substance to this, that if the plaintiffs, in making the contracts for the defendant, contemplated and intended an actual purchase, and an actual sale, but the defendant did not, but, on the contrary, meant to engage in a gambling venture, the contract would, nevertheless, be binding on both parties, and if the plaintiffs cancelled the contracts, the defendant, notwithstanding his intention to violate the laws, could recover from the plaintiffs the money advanced by him to carry out his unlawful purpose. We think this charge was erroneous. Upon the case made by his

counter-claim, the defendant was not entitled to recover, and the fact that the plaintiffs were innocent of any unlawful purpose did not enure to the benefit of the defendant, who confessed that the money which he sought to recover had been paid by him to promote an illegal and criminal venture."

Appellant claims that inasmuch as an illegal intent of the third parties has not been proven, the defense set up in the pleadings has not been sustained. It is true that in each of the pleas, appellee alleges that all parties to the transaction had an illegal intent, but in so far as the intent of third parties may be immaterial, the allegations as to them may be treated as surplusage. Each of the pleas does allege knowledge by appellant of appellee's illegal intent and a participation therein by appellant.

The relation between appellee and appellant was in one sense that of agent and principal; in another that of customer and broker. If appellee had not been a member of the Board of Trade, but had been merely a customer of appellant ordering the purchase and sale of grain through it, appellant could not in all cases recover from appellee for moneys paid out on contracts of purchase and sale made by appellant on appellee's account. Even though such contracts might be entirely valid, as between appellant and the third party, because they had been entered into strictly in accordance with the rules of the Board of Trade prohibiting gambling contracts, and with the intention on the part of both of the parties thereto, the Board of Trade members, to carry them out, nevertheless the right of the broker to hold his client liable would depend upon their mutual intent. If, as between themselves, it was agreed or understood that there should be no actual deliveries, no right to call for the acceptance of grain purchased but only a settlement of the difference between the market price at the time the broker bought and at the time he should be ordered to sell, neither could hold the other liable for such difference. Weare Commission Co. v. People, 209 Ill. 528. But if, on the other hand, there was no such understanding, then the mere fact that the client had bought with the expectation, in case the market were favorable, of re-

selling before the time of delivery should arrive and that the broker knew this, would not render their transaction illegal. The law does not prohibit a man from entering into a contract for the purchase of property to be delivered to him in the future or from ordering an agent to enter into such a contract, even though he may expect under certain contingencies, to sell his rights before maturity and to take his profit or suffer his loss. Such a transaction is legitimate business speculation.

In Christie Grain Co. v. The Board of Trade, 198 U. S. 236, the court said:

"The plaintiff's chamber of commerce is, in the first place, a great market, where, through its eighteen hundred members, is transacted a large part of the grain and provision business of the world. Of course, in a modern market contracts are not confined to sales for immediate delivery. People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.   *   *   *

"When the Chicago Board of Trade was incorporated we cannot doubt that it was expected to afford a market for future as well as present sales, with the necessary incidents of such a market, and while the State of Illinois allows that charter to stand, we cannot believe that the pits, merely as places where future sales are made, are forbidden by the law. But again, the contracts made in the pits are contracts between the members. We must suppose that from the beginning as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time

and another to sell the same amount of wheat at the same time, it would be deemed unnecessary to exchange warehouse receipts. We must suppose that then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery. The ring settlement is simply a more complex case of the same kind. These settlements would be frequent, as the number of persons buying and selling was comparatively small.

"The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says. There is no doubt, from the rules of the Board of Trade or the evidence, that the contracts made between the members are intended and supposed to be binding in manner and form as they are made. There is no doubt that a large part of those contracts is made for serious business purposes. Hedging, for instance, as it is called, is a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture. It is none the less a serious business contract for a legitimate and useful purpose that it may be set-off before the time of delivery in case delivery should not be needed or desired.

"Purchases made with the understanding that the contract will be settled by paying the difference between the contract and the market price at a certain time (Embrey v. Jemison, 131 U. S., 336; Weare Commission Co. v. People, 209 Ill., 528), stand on different ground from purchases made merely with the expectation that they will be satisfied by set-off. If the latter might fall within the statute of Illinois, we

would not be the first to decide that they did when the object was self-protection in business and not merely a speculation entered into for its own sake. It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers or as 'pretended' buying or selling, without any intention of receiving and paying for the property bought, or of delivering the property sold, within the meaning of the Illinois act. Such a view seems to us hardly consistent with the admitted fact that the quotations of prices from the market are of the utmost importance to the business world, and not least to the farmers; so important indeed, that it is argued here and has been held in Illinois that the quotations are clothed with a public use. It seems to us hardly consistent with the obvious purpose of the plaintiff's charter, or indeed with the words of the statute invoked. The sales in the pits are not pretended, but, as we have said, are meant and supposed to be binding. A set-off is in legal effect a delivery.   *   *   *"

The illegal deal is the one in which there is nothing but a wager on the fluctuations of the market, one in which broker and customer intend that as to one another the customer shall not be obligated to take the goods even though, as to the seller, the broker as the apparent principal may be so obligated. Wright, however, was a member of the Board of Trade, and could therefore have entered into contracts with other members in his own name, either for himself or for customers. He was not, however, a member of the clearing house, and for that reason it was more convenient, if not necessary, for him to make the contracts in appellant's name. In some instances, he was employed by appellant to make such contracts in appellant's name, but for other customers of appellant. These do not enter into this controversy. In most instances, however, though the contract was made by him, not in his own name but in appellant's name, thereby making appellant the apparent principal in so far as the other party was concerned, he himself was appellant's customer, for whose use the contract was entered into. He was, as to third persons, not the apparent but the undisclosed

principal; as to them, he was, apparently, only appellant's agent. In this relation, his personal intention to gamble could not have been to gamble with the third persons, but only to gamble with appellant. It is conceivable that he, as appellant's agent, intended that appellant should gamble with the other party to these contracts, but there is no proof in this record either that appellant, itself or through its agent Wright, did so intend. Every contract of this first class made by Wright for appellant with a third party purported to be a legal contract of purchase and sale, and it must be deemed legal for the purpose of this case, as between appellant and the third party.

But as between appellant and Wright, the relation of broker and customer existed. While appellant was bound by these contracts to third parties, Wright was bound, as customer, to appellant, provided that, as between them, there was no illegal intent. In some of the contracts made by Wright, appellant was itself the other party. As to these, the relation between the parties was that of purchaser and seller.

Appellant's right to recover from Wright for the balance of payments made by it for him on purchases from and sales to third persons and for the losses incurred by him when appellant was his purchaser or seller, depends therefore upon whether or not appellant intended or knew that Wright intended that the transactions should, not as between it and the third party but as between it and Wright, be settled solely by the payment of differences.

Wright's own testimony that he himself so intended would, as hereinabove shown, bar him in any event on his claim of set-off, but his illegal intent would not of itself make the contracts between him and appellant illegal or bar appellant from recovering. Only mutual illegal intent rendering the contract as between broker and customer void or appellant's illegal intent rendering it unenforceable on its behalf could prevent a recovery. We need not, however, now consider in detail the evidence relating to appellant's knowledge of Wright's intention and its own intention as to

these contracts for future delivery. Suffice it to say that the evidence in this record is in irreconcilable conflict. Much proper evidence was excluded on the theory that appellant was confined to strictly rebuttal testimony. The plea of illegality put the burden on Wright to prove it and after his testimony to sustain this plea was admitted, appellant was entitled to sustain its traverse of the illegality as fully as if there had been no plea of the general issue. Its testimony was not in rebuttal, but was its original testimony on this issue.

In view, however, of the result reached by us as to the second class of deals made by appellee, it is unnecessary to consider in detail the errors either as to testimony or as to instructions.

This second class is the so-called "ups and downs" or "indemnities."

According to the testimony of Williams S. Crosby, one of appellant's witnesses and a member of the Board of Trade, the indemnity contract was invented by him. In form the transaction is this: After the close of trading hours to-day, not on the floor of the exchange, but in the indemnity room, A pays B $1.00 per 1000 bushels of wheat for a contract indemnifying A against loss above e. g. $1.08 a bushel on a contract under which A is to buy from B 100,000 bushels of wheat deliverable in July, at the close of to-morrow's market if the market closes above $1.08. This is called an up. If, on the other hand, the payment is for an indemnity against loss below e. g. $1.04 a bushel, on a contract under which B is to buy from A if the market closes below $1.04 to-morrow, it is called a down. Whether an up or a down is purchased two contracts, it is alleged, are entered into,—the one a contract made to-day by B in consideration of the $1.00 cash paid by A, to indemnify A for losses that he may incur on a certain specific contract, which, in the event that the market reaches a certain point, both A and B obligate themselves to make; the other, a mutual promise to enter into that contract at the close of to-morrow's market, for the purchase and sale of 100,000 bushels of wheat deliverable in July, at the price

at which to-morrow's market may close, provided it closes, in the case of an up, above $1.08 or in the case of the down under $1.04. The price fixed in the up or down is from a half cent to several cents higher and lower respectively than the close of to-day's market. If to-morrow's market in July wheat should close at a price less than the up or more than the down, no contract of purchase and sale would be made and no loss therefore would have been suffered by A, so that no indemnity would be due him. If, however, in. the case put, A had bought the up and the market to-morrow closed at $1.09, A and B would then enter into a contract for delivery in July by B to A of 100,000 bushels of wheat from the so-called regular elevators in Chicago at $1.09 per bushel to be paid on delivery and B would then in addition pay A $1,000, his loss above $1.08 per bushel because of his having obligated himself to-day to buy 100,000 bushels at to-morrow's closing price if it exceeded $1.08.

Crosby and appellant call this indemnity contract, insurance; insurance loss on a contract. To make an insurance contract valid and not an illegal wager the insured must have an insurable interest in the subject-matter insured. That insurable interest must be a real one. If A owns 100,000 bushels of wheat, he may insure their safety from damage, destruction or deterioration; if he has entered into a contract to sell them to B, or if he has no wheat but has contracted to buy from B; he may insure B's solvency or his performance of the contract; and if on the contract of sale he has a profit, he may insure against loss not merely for the cost but for the selling value, including the profit. More than this: his ownership or absolute contract to purchase would give him such an interest therein that he could insure himself against a decline in the market value of his property. Such a contract is not a mere wager on the fluctuations of the market. There is nothing illegitimate in seeking such protection against loss in the market value of one's property or of one's rights. The legitimate interest in the subject-matter justifies the insurance and differentiates the agreement from a mere wager. And so too if A, a Chicago

grain dealer, has cabled an offer to London to sell 100,000 bushels of wheat at a certain price, which offer may ripen into a contract by acceptance in London before A can effectually withdraw it inasmuch as a contract is complete on acceptance unless notice of withdrawal of the offer is received before the acceptance is given, A would be fully justified in insuring himself against the actual loss that he would suffer in case his offer should be accepted, due to a rise in the market before he had covered. His offer, in the regular course of business, gives him a legitimate and insurable interest against loss from the market fluctuations. And therefore in these indemnity contracts, if the loss insured against were such as would be suffered by A in the example given, no valid objection to them could be urged.

The indemnities involved in the present case, however, cannot be upheld as insurance contracts. What they attempt to insure against is not loss on some prior legitimate business transaction or on some property or property right, but against loss on the very contract the making of which by the parties is obligatory only if there be a loss by the insured in the making of it. It is evident that their purpose was not to protect a legitimate interest; the conditional contract of purchase and sale was added in order to give an apparent interest which they hoped might be deemed such an interest as could be protected by the insurance. In this case, moreover, there is not the slightest proof that Wright bought indemnities to protect himself from losses, on goods either on hand or contracted or offered to be bought or sold; on the contrary, it is clear from the whole evidence that he had no such interest, so that even if they could be treated as insurance contracts, Wright had no insurable interest.

If then, these indemnities are not insurance contracts, how are they to be classified? Are they in any way to be distinguished from contracts for an option, which are declared illegal by sec. 130 of the Criminal Code?

To determine this we must first consider the nature and function of a contract for an option. In form it is an agreement whereby for a consideration B e. g. agrees to-day to

contract to-morrow at A's option to sell to A 100,000 bushels of wheat at $1.08. Its legitimate function is to enable A, the Chicago grain dealer who in the example heretofore given has offered to sell wheat to London, not merely to insure himself against loss if the offer is accepted, but also to secure the grain that would then be needed, to carry out the contract. Its illegitimate function is to enable parties to gamble on the fluctuations of the market.

While a wagering contract was not illegal under the English common law, it is illegal at common law in Illinois and generally in the United States. Such a contract for an option, or in fact any contract any of the essential terms of which are dependent upon market fluctuations, if made as a subterfuge for gambling, would therefore be illegal at common law; but, on the other hand, if made for a legitimate business purpose, it would be entirely legal at common law.

In Ferguson v. Coleman, 3 Rich. L. (S. C.) 99, a contract to pay "$902.50 if cotton should rise to 8 cents by November next and if not to pay $500," given as the consideration in the purchase of land, the value of which depended upon the market price of cotton, was upheld against the objection that it was a mere wager because it was apparent that the parties intended a legitimate business transaction. This, too, is the real basis of the decision in Wolf v. Bank, 178 Ill. 85.

But, in Illinois, contracts for options are not to be adjudged legal or illegal under the rules of the common law; they have been declared void by statute. The legitimate business interest which, at common law, is a basis for upholding some option contracts, has been sacrificed to the greater public interest in uprooting gambling, by declaring even those option contracts which might be legitimate but which because of their form are particularly well adapted for use as mere subterfuges for gambling, to be illegal.

In Schneider v. Turner, 130 Ill. 28, the court, in considering the effect of sec. 130 of the Criminal Code, said:

"  *  *  *  it is insisted that by the prohibition of the statute, the legislature only intended to make unlawful such

option contracts as contemplate a settlement by differences; that to come within the inhibition of section 130 the contract must be a gambling contract; that the option here meant is the option or right to elect whether to accept or deliver the stock or other commodity, or pay the difference between the contract price and the market price when the same should be accepted or delivered under the terms of the agreement. The language of the section, so far as applicable to this question, is as follows: 'Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, stock of any railroad or other company, * * * shall be fined, * * * and all contracts made in violation of this section shall be considered gambling contracts, and shall be void.'

"The first question which suggests itself in considering the construction of this statute contended for by appellants is, if their construction is the true one, why was the statute enacted at all? Nothing is more clearly and firmly established by the common law, than that all gambling contracts are void.. It is equally well settled that all contracts for the purchase and sale of property with the understanding or agreement of the parties (whether that agreement is expressed on the face of the contract or exists by secret understanding) that the property is not to be delivered or accepted, but the contract satisfied by an adjustment of the difference between the contract and market prices, are mere wagers, or gambling contracts, and void. (3 Am. and Eng. Ency. of Law, p. 873, and cases cited in note 1; Cothran v. Ellis et al., 125 Ill. 496.) Long prior to the passage of this statute it had been repeatedly so decided by this court. Therefore the section, as construed by counsel for appellants, serves no purpose whatever. If their construction is correct, when the legislature declared that all contracts made in violation of section 130 should be considered gambling contracts, and void, it only condemned contracts which were already gambling contracts, and void. Certainly more than this was intended. It must be presumed that the object of the legislature was to declare that unlawful which theretofore had been lawful. Prior to this act it was lawful to contract to have or give an option to sell or buy, at a future time, grain or other commodity. Such contracts were neither void

nor voidable at the common law. The statute makes them unlawful and void in Illinois. * * * * *

"We agree fully with counsel for appellants as to the object of the statute. It manifestly is to break down the pernicious practice of gambling on the market prices of grain and other commodities. How is this object sought to be accomplished? There was and is nothing illegal or even immoral in an option contract, within itself. The evil aimed at, nevertheless, grew out of such contracts. * * * In this case the parties *might* have intended, if appellants called for the stock, to settle on differences. The contract *could* have been made the disguise for gambling on the future price of stock of the North Chicago City Railway. The question is not, did they so intend, but, did not the legislature regard such contracts as lying at the root of the evil aimed at, and strike at them. The treatment is heroic, but the evil was most malignant."

After the legislative enactment was thus given its full effect and puts and calls, theretofore indulged in, were abolished by the Board of Trade as illegal, other attempts were made to accomplish a similar object. The courts, however, will not be blinded by forms; the real kernel of a transaction, not its outer shell, will determine its nature and legality.

In Bates v. Woods, 225 Ill. 126, the parties assumed to make two separate deals—the one a mere offer, not a binding contract, to sell at a certain price at the close of the next day's market; the other a contract based on a valuable consideration, to hold the offer open until that time. The court, however, found no difficulty in holding that the two were intended to be and were essentially one and that one, a binding contract for an option,—a mere device which it held would not be permitted to circumvent the law. It said:

"To say that the statute does not prohibit contracts such as the one now before us is to hold that the evils sought to be remedied by its enactment may be continued by the use of a mere device, whose plain object is to avoid the provisions of the statute. * * * * *

'"That portion of the statute which renders void, contracts

made in violation thereof, is remedial in its character and should be liberally construed.

"In People v. Harrison, 191 Ill. 257, we said: 'A thing within the intention is regarded as within the statute though not within the letter  *  *  *  The intention is to be gathered from the necessity or reason of the enactment, and the meaning of words enlarged or restricted according to the true intent.' A contract such as the one in this case is clearly within the mischief which the statute was intended to remedy, and should, we think, be regarded as within the enactment."

While apparently under these indemnities two contracts are made, one to indemnify and the other conditionally to contract for the purchase and sale of grain, in effect and in fact, there is but one transaction. On an up deal B e. g., in consideration of $100 paid to him by A, agrees, if to-morrow the market shall close above $1.08 to sell to A 100,-000 bushels July wheat at $1.08; the transaction to be consummated by A paying B at to-morrow's market rate, $1.09, on the delivery in July and B paying A the difference of 1 cent per bushel to-morrow. If the market closes at $1.08 or lower, A has lost $100; if it closes above that at $1.09 he has won $1,000 less the $100.

That these alleged two contracts are really interdependent and essentially one is apparent when they are analyzed. A has not in truth agreed to buy from B at to-morrow's market if the market which to-day is $1.05 goes above $1.08 to-morrow; he has so agreed, provided B pays him the difference between $1.08 and the market; in other words they have agreed to contract at $1.08, but only if the market is above that figure; if it is not above, then no contract is to be made. To induce B to make the deal, A pays him the consideration. There is to be a contract or no contract dependent upon the market fluctuations just as there will or will not be a contract, on the same contingencies, under an "option" purchase.

In an indemnity deal, it is true, the parties are obligated to enter into a contract if the market reaches a certain point,

whereas in an option deal they are not so obligated. But is this more than a difference in form? If A had paid $100 for the contract for an option to buy at $1.08, B would have been bound to sell, but A would not have been bound to buy; in order, however, to get the very thing he was after—the profit—he would of course have exercised his option, if the market closed at $1.09. Instead of being privileged, as in a put or call, to get his profit by making a contract, in the up or down deal, he binds himself to make a contract if he can thereby earn a profit. Under neither form is he bound, in the absence of a profit. There is, in our judgment, no substantial difference, in a Board of Trade deal, between the right to enter into a contract under the market price and thereby through a resale to make a profit represented by the difference between the market and contract prices and the obligation to make such a contract at the market price coupled with the right to the payment of the same difference.

The one as well as the other could be used for legitimate business purposes; but as the Legislature has subordinated this interest to a higher public interest, and as the very evils aimed at are accomplished in practically the same manner by each, as the two are in effect and in substance the same, we hold that the indemnity contracts fall under the option ban and are illegal, irrespective of any intent to consummate or not to consummate the conditional contract of purchase and sale, and irrespective of an intent to protect thereby some legitimate interest. These indemnities are in substance nothing but the illegal puts and calls clothed in a new but in a no less vulnerable armor.

Ordinarily when Wright sold an indemnity the premium was paid direct to him and sometimes when he bought one it was paid by him. Frequently, however, such payments were made for him and received for his credit by appellant. Whenever an indemnity materialized, that is, whenever the market closed above or below the fixed price on the purchase or sale of an "up" or "down" respectively, the contract for future delivery would be made by appellant with the other party for appellee, and where appellee sold the indemnity

the loss incurred by him would also be paid by appellant for and charged to him. Such payments were with full knowledge by appellant of the character of the deal, therefore, as we must hold, with full knowledge of its illegality. Moreover appellant knew that Wright entered into them without having any legitimate interest to protect. The so-called premiums were advanced by appellant for Wright to bring about an illegal transaction; the indemnities were paid, not merely as a loan to him by appellant without reference to or intent to further an illegal transaction, but, viewing what the parties call two contracts as in effect one, it was a payment necessary to induce the completion of the agreement. Without it, the winner would not have been obligated to enter into the contract for future delivery. The contract for future delivery might, viewed alone, be a valid contract if actual delivery was in fact contemplated; but viewed, as we think it must be, not as a contract separate and distinct from the indemnity, but as a part of the single contract for indemnity and for future delivery, the illegality of which pervaded every part of it, it was illegal. Moreover in the present case, not only did appellant consummate for Wright these deals, known by it to be illegal, but the evidence is clear that it as well as at least one of its officers made such illegal deals direct with Wright contrary as well to the rules of the Board as to the law of the land. The payments made by appellant for appellee on and in furtherance of such illegal transactions, enter into the account and note sued upon.

Appellee contends that as this case was tried solely on the count declaring on the account stated and the count on the note, there can be no recovery if any part of the transactions which make up the account and form the consideration for the note is illegal. We are of the opinion that there is no difference in this respect between an account stated and a promissory note, each embracing numerous transactions. In each, the former transactions are merged in the new obligation. Throop v. Sherwood, 4 Gilm. 92, 98. In each, the action is based, not on the original transactions but on the new promise. That this is express in the case of the note,.

and may be only implied in the case of the account stated, seems to us to be immaterial. Our Supreme Court has expressly held that at common law there can be no recovery on a note or on any other promise any part of the consideration for which is illegal. Douthart v. Congdon, 197 Ill. 349; First Natl. Bk. v. Miller, 235 Ill. 135; Ramsay v. Whitbeck, 183 Ill. 550. That this same principle prevails as to the implied promise arising out of an account stated is held in Kennedy v. Broun, 13 C. B., n. s., 677, at 741.

The case might have been tried on the other common counts and proof made of each transaction that entered into the account. If that had been done, a recovery for so much of the indebtedness, if any, as might be found to be legal, would have been justified. But plaintiff's case was rested on proof of the delivery of the statement of the balance due and defendant's failure to object thereto,—proof only of an account stated. Moreover the fact that the account rendered was not of the final balance but began with the balance due April 30, 1907, and then itemized the transactions of May and ended with the final balance due May 31, 1907, would not, in this case, justify a recovery on the legal transactions, if any, during the month of May. The failure of Wright to object to the statement when delivered to him, might evidence not only an assent to the balance and therefore support the count of an account stated, but also an assent to the correctness of the items enumerated, and therefore support the count of money advanced. But the parties tried the case solely on the count declaring on the account stated and they cannot now urge that there is evidence which would support another count of the declaration. The right of examination and cross examination would have been very different if the case had been tried on the other counts. As the court says in Dick v. Zimmerman, 207 Ill. 636, at 638:

"This suit was tried on the part of the plaintiff upon that count of the *narr.* declaring upon an account stated. He testified in his own behalf to interviews with the defendant in which the account was presented to the defendant, * * * On cross-examination counsel for defendant

sought to examine plaintiff regarding the correctness of certain items included in the account. The court sustained an objection, saying, 'There is nothing to cross-examine him about except these interviews he has testified to and these letters,' and it is urged that the right of cross-examination was thereby improperly limited, * * *. The ruling was correct. Plaintiff was not asking to recover upon the original account, but upon the alleged agreement or account stated, by which the amount due was fixed.

'In an action upon an account stated, the original form or evidence of the debt is unimportant, for the stating of the account changes the character of the cause of action, and is in the nature of a new undertaking. The action is founded, not upon the original contract, but upon the promise to pay the balance ascertained.' Throop v. Sherwood, 4 Gilm. 92.

"Plaintiff had testified only in reference to the interviews, resulting, as he said, in an agreement fixing the sum due, and in relation to the letters, and the cross-examination was properly confined to the same matters. The remark of the court was a terse and accurate statement of the law applicable to the situation * * *."

Inasmuch, therefore, as the court would have been justified for the reasons herein set forth in directing a verdict for the defendant, the judgment in his favor must be affirmed.

*Affirmed.*