**Lorenzo Lamson, Warren A. Lamson and Leslie Gates, Partners, Appellees, v. Lawrence J. West, Appellant.**

1. GAMING, § 9*—*when pretended purchase or sale of grain through broker is gambling transaction.* A pretended purchase or sale of grain made through a broker when neither the broker nor his client intends or expects that as between them the commodity will be delivered or received, but both of them do intend that the losses or profits on the transaction shall be determined by the difference between the market price of the same when the deal is

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number,

opened and when it is closed, or, in other words, when the intention is that the client shall win or lose money on the fluctuations of the market, it is as between them a gambling contract, and is not enforceable.

2. GAMING, § 9*—*how question whether transaction with broker is a gambling transaction determined.* The question whether a transaction between a broker on a grain exchange and his customer is a gambling transaction in no wise depends upon the relation between the broker and the party with whom he deals in carrying out his customer's orders.

3. GAMING, § 18*—*when broker may not foreclose mortgage.* In a suit to foreclose a mortgage given as security for a note given by a customer to a broker on a grain exchange in payment of losses sustained as the result of transactions on the exchange, where the evidence showed that the plaintiff knew that the defendant did not intend to receive or deliver any grain but that he intended to gamble on the rise and fall of prices, *held* that a decree of foreclosure was erroneous.

4. GAMING, § 20*—*when broker may not recover for services or for losses.* When a broker engages to assist his client in committing the crime of gambling, he cannot recover from such client for his services or for losses incurred by himself on behalf of such client in forwarding the transaction.

Appeal from the Circuit Court of McLean county; the Hon. COLOSTIN D. MYERS, Judge, presiding. Heard in this court at the October term, 1915. Reversed and remanded with directions. Opinion filed April 21, 1916.

DE MANGE, GILLESPIE & DE MANGE, for appellant.

MOSES, ROSENTHAL & KENNEDY and LIVINGSTON & BACH, for appellees; WALTER BACHRACH, of counsel.

MR. JUSTICE GRAVES delivered the opinion of the court.

Appellant is a farmer and grain buyer at Glenavon, McLean county, Illinois, where he had two grain elevators having a joint capacity of 35,000 bushels of corn. Appellees are partners in the brokerage business and are members of the Chicago Board of Trade,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

maintaining offices in Chicago and a branch office in Bloomington, which was in charge of and managed by one Kelly. Appellant "did business" with appellees for several months. This "business" consisted of ostensibly buying and selling grain in the Chicago markets. All told the "business" transactions aggregated about 1,700,000 bushels of grain, worth approximately $1,000,000, involving 157 different transactions. He was then worth from $60,000 to $100,000. These transactions were settled from time to time by appellees paying to appellant the profits he realized or by his paying them such losses as he sustained. That is, if appellant "bought" grain and the price of the grain increased, he would close the deal and appellees would pay him the difference between the market price when he "bought" and the market price when he closed out the deal. If the price of grain was lower when he closed out the deal than it was when he "bought" the grain, then he paid appellees the difference between the two prices. When he "sold" grain and the market price was lower when the deal was closed than when it was opened, appellees paid appellant the difference and when the price was higher appellant paid appellees the difference. The market price of the commodity ostensibly purchased or sold by appellant was the criterion by which these settlements were made. The grain dealt in was not delivered nor was its delivery demanded at any time by either of the parties to this suit. Appellees executed these orders to buy or sell grain by making purchases or sales in their own name on the Board of Trade, and when the deals were closed settled with those with whom those deals were made. At times, if not at all times, when the deals showed a loss to appellant, appellees advanced the amount of such loss to those on the Board of Trade with whom the deals were consummated, expecting to be reimbursed by appellant. Appellant never knew who such persons were with

whom the deals were consummated. In June and July, 1911, appellant "sold" over 100,000 bushels of corn through appellees' agent Kelly, and when the deal was closed out, his losses amounted to $7,000, and he gave to appellees his note secured by a mortgage for that amount. This note not being paid at maturity, appellees began suit in the Circuit Court of McLean county to foreclose the mortgage given to secure it. In due time a decree was entered requiring appellant to pay appellees by a short day $8,950.

If these deals were bona fide purchases and sales of grain with the bona fide intention of all parties concerned to have the grain delivered according to the terms of the contract, then the decree is right. On the other hand, if the transaction was a gambling transaction, it is void and unenforceable as to all who knowingly participated in it. *Nash-Wright Co. v. Wright,* 156 Ill. App. 243; *R. E. Pratt & Co. v. Ashmore,* 224 Ill. 587-590; chapter 38, sec. 132, Hurd's Rev. St. 1911 (J. & A. ¶ 3735).

A pretended purchase or sale of grain made through a broker, when neither the broker nor his client intends or expects that as between them the commodity will be delivered or received, but both of them do intend that the losses or profits on the transactions shall be determined by the difference between the market price of the same when the deal is opened and when it is closed, or, in other words, when the intention is that the client shall win or lose money on the fluctuations of the market, it is as between them a gambling contract, and is not enforceable. *Jamieson v. Wallace,* 167 Ill. 388, affirming 60 Ill. App. 618. In that case a bill was filed by the client against her brokers to recover back certain collaterals placed by her in their hands to make up losses which they claimed she had sustained in certain deals in stocks, made by them for her in the New York market, which she also claimed were to be settled for between herself and her broker

on the rise and fall of the market. The answer of the defendants denied the substantial averments of the bill and alleged that the stocks were, in fact, purchased in the New York market and paid for, by them; that the collaterals were placed in their hands to secure them from loss from shrinkage in the value of the stock purchased, and that the transaction in New York was a bona fide purchase. On that point the Supreme Court said: "But whatever may be the fact as to the nature of the transaction between the appellants and those representing them in New York, so far as the transactions now involved are concerned, appellants and appellees were principals. The contract between the appellee and the appellants is the only contract which can be regarded in the decision of this case, * * * If the understanding between appellants and appellee was that the deal as between themselves should be settled upon differences, and that there should be no delivery of the stocks, then the contracts as between them were gambling contracts."

In the case at bar, the contract sued on is one made between appellees, the brokers, and appellant, the client. It in no way involves the contract made by appellees, as appellant's broker, with the other broker or his client, with whom the orders to sell or buy were placed.

If it was the purpose and intent of appellant to use the forms of legitimate trading on the Board of Trade for the purpose of putting over a gambling transaction, and appellees knowing or being satisfied that such was appellant's purpose, for the sake of the commissions they might thereby derive, lent themselves and their position as brokers and members of the Board of Trade to further such unlawful purpose, then the transaction between them and appellant was a gambling enterprise and was unlawful and criminal under section 132 of chapter 38, Hurd's Revised Statutes of 1911 (J. & A. ¶ 3735), then in force, and the relation

between these parties in such transaction was not that of broker and client or principal and agent, but was that of principal and accomplices in crime (*Weare Commission Co. v. People*, 209 Ill. 528-542), and neither can recover from the other the fruit of such unlawful enterprise.

The master in chancery to whom this cause was referred found that it was appellant's intention to gamble on the market. There is no exception to that finding, and it is amply supported by the testimony of appellant as well as by all the circumstances shown by the evidence. As to whether appellees knew that such was appellant's intent, there is no testimony of any witness who heard appellant tell them in so many words "I am going to do some gambling on the markets, and I want your assistance," but the evidence in the record is quite as convincing as such testimony would have been. It shows that Kelly, appellees' agent at Bloomington, knew appellant, had seen his small elevators, knew their capacity approximately, and the limited amount of grain that could be handled through them, had almost daily conversations with appellant, either face to face or over the telephone concerning the deals; advised him when to "*get in*" or "*get out*," and knew something of his financial worth. His knowledge was the knowledge of his principals. Besides these things appellees had personal knowledge that between October 5, 1910 and July 27, 1911, appellant had entered into 157 different trades in grain, for they had placed them; that these deals were all "settled" before the day of delivery; that they had given him several checks for "profits" he had made; that they had received checks from him in settlement of his losses; that these checks corresponded with the amounts the books of appellees showed were due to or from them at such times; that the totals of his deals far exceeded his needs as well as his financial ability to handle; that several of such deals were begun

and closed on the same day; that in all of these transactions not a bushel of grain was ever delivered by or to appellant; that but one carload of grain was ever sent by appellant to appellees and that was not in connection with any of the 157 deals here in question; that during the time these deals were made, appellant was shipping the natural output of his elevators to other consignees; that appellees frequently demanded "margins" but never demanded the shipment of grain. They knew that appellant's name did not appear and that he was not known in any of the transactions on the Board of Trade. These and many other circumstances lead to the irresistible conclusion that appellees knew that appellant was gambling in margins.

It would certainly be an unsophisticated person who would not be convinced to the point of absolute certainty that the deals, so far as appellant was concerned, were gambling ventures and not purchases and sales of grains. Yet knowing such facts, appellees paid appellant's losses and charged the same, together with their commissions, to him on their books, thereby aiding and abetting him in his gambling transactions. But one of appellees' firm took the stand to deny knowledge that these deals were gambling deals, neither was Kelly, the agent, called to the stand to deny it, but if they had all denied it, their testimony could scarcely have weakened the convincing force of the circumstances which tend to show they all knew to the contrary.

When a broker engages to assist his client in committing the crime of gambling, he cannot recover from such client for his services or for losses incurred by himself on behalf of such client in forwarding the transaction. *Pope v. Hanke,* 155 Ill. 617-623.

The decree of the Circuit Court is therefore reversed and the cause is remanded with directions to that court to dismiss the bill for want of equity.

*Reversed and remanded with directions.*