In re Estate of Norman Towne, Deceased, Appellee, v. Claim of Charles W. Buckley, Appellant.

Gen. No. 27,878.

1. GAMBLING CONTRACTS—*when claim against estate shown to be for gambling contract.* A claim against an estate was properly disallowed under Cahill's Ill. St. 1923, ch. 38, ¶ 308, condemning as void all contracts for future options in grain, to be settled by payment only of differences in price and not by receipt or delivery of the grain, notwithstanding evidence that claimant, who was a grain broker, actually executed all orders placed with him by decedent in conformity with Board of Trade rules and that bona fide sales or purchases resulted therefrom under which the broker, who executed all orders under his own name, became obligated to receive or deliver definite amounts of grain or rights therein, where the evidence tended to show that claimant regarded the transactions as gambling and showed that claimant was on intimate terms of friendship with decedent and knew his financial condition, that large transactions were conducted practically without margins or collateral, that in many instances settlements were actually made on differences between market prices, that decedent was not in the grain business and that the magnitude of the operations was far beyond decedent's financial ability and that claimant knew that fact.

2. APPEAL AND ERROR—*presumption on appeal of regularity of proceedings from silent record.* On appeal it will be presumed that a special interrogatory, which the record recites was submitted to and answered by the jury, was submitted to opposing counsel before the commencement of the argument to the jury, where the record is silent on that subject, especially where it succinctly stated the whole issue and could not have been harmful.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the third

division of this court for the first district at the October term, 1922. Affirmed. Opinion filed October 17, 1923.

JOHN A. BROWN, for appellant.

NEWMAN, POPPENHUSEN, STERN & JOHNSTON, for appellee; EDWARD R. JOHNSTON and HENRY JACKSON DARBY, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

Between August 1, 1919, and January 10, 1920, one Norman Towne had a series of transactions on the Board of Trade in Chicago, through the brokerage firm of Buckley & Company. On December 31, 1919, he gave Buckley & Company two promissory notes, one for $13,000 and one for $4,000, each due in thirty days, with interest at seven per cent per annum. They were given to cover his account up to December 31, 1919. Norman Towne died on January 10, 1920, and upon closing up his transactions he owed, according to the claim of Charles W. Buckley, who did business as Buckley & Company, in addition to the two notes the sum of $1,287.87, making his total liability, without interest, $18,287.87.

In the probate court of Cook county, in the estate of Norman Towne, Charles W. Buckley filed a claim for that amount. It was disallowed, and an appeal was then taken to the circuit court where there was a trial by court and jury and a verdict and judgment in favor of the estate. The petitioner, Charles W. Buckley, appealed therefrom, and now asks this court to reverse the judgment of the probate and circuit courts.

Norman Towne was a grandson of Judge Caton. When he was twenty-one years of age he inherited from him an income of about $13,000 a year. At the time of the trial he was thirty-seven years of age. He died on January 10, 1920. Most of his life was spent

in Evanston, Illinois. He was a close friend and neighbor of the Buckley family. At one time he was interested in the reclamation of certain lands in Arizona. That property was contiguous to some which was owned by Buckley. It was finally lost through foreclosure. Towne returned to Evanston from Arizona in April, 1919. On April 18, 1918, he was married, for the second time. He had one child by his first wife. The child died before he did. Upon his death his interest in the Caton estate passed to his brother, John Towne. From December, 1918, to April, 1919, he and his wife lived in New Orleans. He seems to have had some interest in a plantation in Louisiana, which was finally lost through foreclosure. He never had any trade, profession or regular occupation. The inventory of his estate, an uncertified copy of which was offered in evidence, showed assets of $59,872.85. Apparently that included $50,000 insurance which his widow collected after his death. The premiums on the insurance had been paid by her husband, the deceased.

On August 1, 1919, Norman Towne began dealing in grain on the Chicago Board of Trade through the office of the claimant or petitioner, C. W. Buckley, doing business as Charles W. Buckley & Company. Towne's first transaction was the purchase of 5,000 bushels of corn on August 1, 1919, on which he made a profit of $85.58, which he was immediately paid. On his second transaction, being 20,000 bushels of corn he made a profit of $6.28 and on the third, which was the purchase and sale of 5,000 bushels of December oats, on September 5, 1919, he had a loss of $31.99. The evidence shows that Towne between August 1, 1919, and his death, had a large number of deals with the claimant; and that the number of bushels of grain dealt in ran up in the neighborhood of 4,300,000 bushels, worth on the market over $4,500,000.

The brother of the deceased, one John D. Towne, testified that after Norman Towne's death he had a talk with the claimant, and that the latter said that at the time Norman began trading, he, the claimant, was out of town and as soon as he came back he stopped it; that the claimant said Norman gambled all over town and that he tried to stop it and talked to him a great many times trying to get him to stop. Whitman, also, testified that, in a talk with the claimant, the latter said that if Norman wanted to gamble he had that right. The claimant in his testimony undertook to qualify what Whitman said, by intimating that, by saying Norman gambled, he meant as to horse races, cards and ball games. Towne when he began trading deposited with the claimant neither collateral nor margins.

The chief question that arises is whether what took place were gambling transactions and, so, void. It is enacted by statute that: "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, * * * where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof * * * shall be fined * * * or confined in the county jail * * *; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." (Cahill's Ill. St. 1923, ch. 38, ¶ 308.) Whether part, at least, of the alleged indebtedness arose as the result of a violation of the law, depends upon a determination of the intention of both of the parties. Towne was dead, and so, of course, did not testify. Buckley testified that his company executed the orders that were given and that they had to be in conformity with the rules of the Board of Trade. Hartigan, the claimant's manager, testified that the

orders were carried out, that is, that the sales and purchases were actually made by the claimant through brokers on the Board of Trade. Some of Towne's deals were in the nature of bids and offers, a bid being a privilege to buy and an offer being a privilege to sell. On October 3, 1919, for example, Towne gave an order to buy 5,000 bushels of December corn at $1.24⅛ a bushel and on the same day, through the claimant, gave an order to sell 5,000 bushels of December corn at $1.23¼ a bushel, and on the claimant's books he was then charged with a loss of $31.25. And on October 4, 1919, Towne gave another order to buy 25,000 bushels of May oats at seventy-two seven and on the same day an order to sell 25,000 bushels of May oats at seventy-three four, and was then credited with a profit of $31.25. All such transactions were carried out by the claimant, that is, each bid or offer was made through some broker in the pit, and a binding contract thereby consummated between the claimant and some third person, and the claimant then remained liable for the full amount involved until it was settled through the delivery of warehouse receipts or by a resale or some transfer of the obligation or right itself, generally accomplished through the Board of Trade Clearing House. The broker in the pit, when making the bid or offer, or purchase or sale, knew only the claimant; acted only for him and on his orders, and knew nothing of Towne. Assuming, therefore, what the evidence actually shows, that in every case where Towne gave an order it was carried out by the claimant and resulted in a bona fide purchase or sale of grain or some right concerning grain at a future day by the claimant, so that the latter, as the result of Towne's orders, legally assumed, from time to time, very great pecuniary obligations, may it reasonably be said, bearing in mind, also, the claimant's testimony, his knowledge of Towne, his habits and his estate, that it was the intention of both parties to settle

not by delivery but by the payment of differences in price?

The law makes liability depend upon a matter of pure psychology; and, yet, it is common knowledge that in judging human conduct to discover intention, it is easy to err. And it is no wonder, therefore, that the decisions in kindred Board of Trade cases are seemingly somewhat in conflict. *First Nat. Bank of El Paso v. Miller*, 235 Ill. 135, merely holds that the intention of the broker was a material and vital question, "substantially the gist of the action." Likewise, *Ennis v. Edgar*, 154 Ill. App. 543, that it is the intention of the parties that gives character to the transaction. The case of *Johnson v. Milmine*, 150 Ill. App. 208 (1906), however, quite strongly supports the contention here made by the claimant. In that case one Probst, a practicing lawyer, had about 248 deals, involving much more than his financial condition would seem to justify. There was evidence that Probst had no intention either to receive or deliver the property alleged to have been bought or sold. There was also evidence that the brokers did intend delivering. But, the court, giving great weight to the fact that the broker, as here, merely for the regular commissions, assumed great obligations, held that it was inherently improbable that the brokers intended that Probst should not be required to receive the commodities which they purchased for him. As said in that case, the burden of showing that the contracts are gambling transactions is upon the one who asserts that fact; and the proof must be made "by a clear preponderance of the evidence." In *R. E. Pratt & Co. v. Ashmore*, 224 Ill. 587 (1907), where the court held certain purchases and sales were gambling transactions, the following language occurs: "At the time the grain was bought the defendant in error was not engaged in the grain business and had not been for some time. He was worth about $25,000, and yet in less than thirty

days he bought on the Board of Trade, through R. E. Pratt, who must have known his financial standing, 140,000 bushels of rye at seventy cents per bushel, amounting to about $100,000. To make the purchase, however, he was only required to advance between $4,000 and $5,000. In addition to this purchase he made others on the Board of Trade, the amount of which does not definitely appear, but they were all settled by the payment of differences and not by the delivery or offer to deliver the grain." It will be seen, therefore, that the five elements, (1) not being in the grain business, (2) insufficient financial ability, (3) knowledge of that fact by the broker, (4) deposit of small amounts as credits, and (5) other purchases which were settled by the payment of differences, were sufficient to show that it was the intention of both parties to settle according to the fluctuations of the market. *Lamson v. West,* 201 Ill. App. 251, practically affirms the same principle.

In *Jamieson v. Wallace,* 167 Ill. 388, the court says that in determining intention, the mode of dealing, the pecuniary ability of the customer and dealing only upon margins, are all to be considered, and then, apparently, in the final analysis, holds that as the purchases that were made were all out of proportion to the customer's ability to pay, the brokers must have intended merely to settle by the payment of differences. *Pelouze v. Slaughter,* 241 Ill. 215, holds that where the only ground for claiming there was an intent to gamble and settle by differences is that the transactions were of great magnitude in proportion to the wealth of the customer, it is not sufficient merely to show that a great deal of money was involved when the evidence does not show that there ever was a balance, above the market value of the commodities, that the customer could not pay. The court says: "While the appellees bought a great many stocks, they sold a great many, and at the death of Mrs. Thompson she

could have paid for all the stocks, and her liability to appellees, above their value, was not large compared with her estate." In the instant case, however, all of the elements that we have referred to were present. Towne was not in the grain business, he had insufficient financial ability to justify the magnitude of his deals, the claimant knew his general financial condition, in fact was quite intimately acquainted with him, his credit deposits were small, and a number of deals, beginning with the first one, were settled by the payment of differences.

We think the reasoning of *R. E. Pratt & Co. v. Ashmore, supra,* is decisive. Considering, therefore (1) that the jury may have believed the testimony of John D. Towne and Whitman; (2) that the claimant knew Towne well; (3) that large transactions were conducted practically without collateral or margins; (4) that many settlements were actually made by differences; and (5) that the claimant knew Towne was not in the grain business, we do not feel justified in concluding that the verdict of the jury should have been set aside and a new trial granted.

It is contended for the claimant that error was committed by the trial judge concerning an interrogatory that was submitted to the jury. The record recites, immediately after the instructions, that the following interrogatory was submitted: "Did Norman Towne and Chas. W. Buckley or his agents * * * intend as between themselves to settle such transactions by the payment of the differences only," etc. It also shows that the jury answered it in the affirmative. Counsel for the claimant contends that no special interrogatory was submitted to him before the commencement of the argument to the jury, and that that was error. Cahill's Ill. St. 1923, ch. 110, ¶ 79. Inasmuch, however, as the record is silent on that subject, we must presume that the interrogatory was properly submit-

ted. 4 Corpus Juris 774. Further, it succinctly stated the sole issue and could work no harm.

It is contended, further, that errors were committed in regard to the admissibility of certain evidence. We have examined those matters, but do not find that any substantial error was made.

The judgment will, therefore, be affirmed.

*Affirmed.*

O'Connor, J., and Thomson, J., concur.