# Alonzo J. Cutler, Appellant, v. Charles W. Pardridge, Appellee.

## Gen. No. 17,375.

1. EVIDENCE, § 46*—*when burden of proof is on defendant.* A defendant relying upon affirmative defenses has the burden of proving them.

2. INSTRUCTIONS, § 18*—*when an instruction is misleading.* An instruction requiring the plaintiff to establish "his case" by a preponderance of evidence is misleading when there is no controversy as to the plaintiff's case, but only as to the defenses thereto.

3. GAMING, § 13*—*when contracts are invalid.* In an action to recover commissions and money lost on certain board of trade transactions, an instruction that plaintiff could not recover if he knew "or by the exercise of ordinary prudence and care ought to have known" that the defendant simply intended to wager upon the future prices of commodities and to settle all such contracts by the payment or receipt of differences in market prices is erroneous, since such contracts are not invalid unless neither party has the intention of delivering the property, and such question of intention is to be determined from all the evidence, the nature of the transaction and the method of carrying on business.

4. BROKERS, § 1*—*what constitutes.* The term "broker" applies as well to a broker on the Board of Trade as to one on the Stock Exchange.

*See Illinois Notes Digest, Vols. XI to XIV, same topic and section number.

5. BROKERS, § 4*—*when broker must be licensed.* If the construction given to a city ordinance licensing brokers by those intrusted with its enforcement is entitled to consideration, it would have no weight when the language of such ordinance is free from doubt, as where it defines a "produce and grain broker" as one "who, for a commission or other compensation, is engaged in selling or negotiating the sale of * * * produce or grain belonging to others."

6. BROKERS, § 28*—*when compensation and advances are recoverable.* While an unlicensed broker cannot recover commissions for his services he may recover for advances made in negotiating contracts for a customer, when such contracts are not prohibited or against public policy.

7. GAMING, § 10*—*what not proof of agreement to settle on difference.* Proof of settlement of Board of Trade transactions between brokers thereon under its rules for "set-off," and "ringing off" is not evidence of an agreement between broker and customer to settle by payment of difference such as prohibited by statute.

Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1911. Reversed and remanded. Opinion filed October 14, 1913. Rehearing denied October 29, 1913.

HENRY S. ROBBINS, for appellant; MARTIN H. FOSS, of counsel.

BRADLEY, HARPER & EHEIM, for appellee.

MR. JUSTICE BARNES delivered the opinion of the court.

This case comes here on appeal for the third time. Opinions rendered on prior appeals appear in 68 Ill. App. 569, reversed in 168 Ill. 504; and 104 Ill. App. 89. On each of the other occasions the judgment was in favor of plaintiff; this time it is against him. The suit, based on the common counts, was to recover commissions and money paid out for losses on certain transactions made by appellant for appellee on the Board of Trade of the city of Chicago.

Appellee relied on three defenses: (1) that they were gambling transactions; (2) that the contracts

were wrongfully closed out in violation of a contract for credit; (3) that appellant could not recover his advances or commissions because he had not taken out a broker's license under an ordinance of the city of Chicago. This last defense was not made in the former trials.

Appellant procured no license under the ordinance pleaded which made it unlawful for any person to exercise the business of broker, including that of produce or grain broker, without having first procured a license for such purpose, and imposed a penalty for its violation. One plea set up the ordinance as a bar to the entire suit, and another to the recovery of commissions. A demurrer to the first was sustained, the court thereby holding it was not a bar to the recovery of advances, and that to the second was overruled. Cross-errors are assigned to the first ruling mentioned, to which we will refer later.

There was a flat contradiction in the testimony relating to the first two defenses. The facts were sharply controverted. The testimony on the issues raised by them unquestionably presented a case for the jury. On substantially the same character of testimony it was so held on the former appeals. It was important, therefore, that the jury should have been accurately instructed with respect thereto.

Plaintiff's case consisted of proof of the individual transactions engaged in at defendant's request. Defendant did not deny that they took place, or that the plaintiff was his authorized agent. He relied upon affirmative defenses, and the burden of proving them unquestionably rested upon him. *Pelouze v. Slaughter,* 241 Ill. 215; *Richelieu Hotel Co. v. Military Encampment Co.,* 140 Ill. 248; *Cothran v. Ellis,* 125 Ill. 496; *Clews v. Jamieson,* 182 U. S. 461. The case, therefore, as tried and submitted to the jury, presented no contention as to plaintiff's case, whether the transactions he relied on took place and were authorized, but simply whether defendant had established his affirma-

tive defenses, or either of them, that such transactions were invalid and closed out in violation of a contract for credit.

On the question of burden of proof, the Court gave the following instruction: "The plaintiff is required by law to establish *his case* by a preponderance of the evidence before he can recover. If the plaintiff in this suit has not established *his case* by such preponderance; or if the evidence in support of *his case* is evenly balanced so that the jury are in doubt and unable to see on which side is the preponderance; or if the preponderance of the evidence is in favor of the defendant; then in either of these cases the jury should find the issues for the defendant."

What the jury understood by "his case," in view of the fact that there was no controversy as to plaintiff's case, but only upon the defenses thereto, it would be difficult to say. We think it was misleading. The jury were presumably not acquainted with the distinction between plaintiff's case, which as submitted to them was not controverted, and hence called for no special direction of the jury as to the burden of proof with respect thereto, and the case which, as tried and submitted to them, involved only such controversies as were raised by affirmative defenses. They might, and probably did, think that before plaintiff could recover he was bound by law to establish the negative of such defenses. The case of *Rich v. Naffziger*, 248 Ill. 455, is in point. There plaintiff brought an action *quare clausum fregit* and proved a record title to the close or premises in question. Defendant set up an affirmative defense,—adverse possession of the premises for a period of twenty years. Plaintiff's record title was proved and not questioned, but at defendant's request the court instructed the jury that the burden was upon plaintiff to prove the allegation that he was the owner of such close by the greater weight of the evidence, and that if the evidence was equally balanced

or preponderated in favor of defendant, then upon
that question their verdict should be for defendant.
The instruction was held erroneous because the jury
would understand therefrom that it required plaintiff
to prove by a preponderance of the evidence, in order
to establish his ownership and title, that defendant
and his predecessor in title had not had adverse pos-
session of the premises for the period of twenty years.
And here the jury would understand from the instruc-
tion in question that in order to establish plaintiff's
claim, namely, for money paid out on transactions for
defendant at his request, he would be required to
prove by a preponderance of evidence that they were
not gambling transactions, and that no such contract
for credit as claimed by defendant had been entered
into or violated; in other words, that he was required
to disprove defendant's claim. This, as stated in the
*Rich* case, *supra,* he was not required to do. In view
of the closeness of the evidence upon the issues, we
are not satisfied that the jury were not misled to the
prejudice of appellant by such instruction, and that
there should be a new trial on that ground if for no
other.

In view of this ruling we deem it necessary to refer
to such instructions only as raise questions likely to
be presented again on another trial. In number four-
teen the jury were told that "if plaintiff knew, *or by
the exercise of ordinary prudence and care ought to
have known*  *  *  * that the defendant  *  *  *
intended simply to speculate or wager upon the future
prices of such commodities and to settle all such con-
tracts by the payment or receipt of differences in
market prices," he could not recover.

In order to invalidate such contracts it was held in
*Jamieson* v. *Wallace,* 167 Ill. 388, that it must appear
that neither party has the intention to deliver the
property, and that both parties have the intention of
settling the differences only. To the same effect are
*Bartlett v. Slusher,* 215 Ill. 348; *Pratt & Co. v. Ash-*

*more*, 224 Ill. 587; *First Nat. Bank of El Paso v. Miller*, 235 Ill. 135; *Pelouze v. Slaughter, supra; Clews v. Jamieson, supra.*

In these cases, and others that might be cited, it was held that the question of intention was to be determined by a consideration of all the evidence and may be determined from the nature of the transaction and from the manner and method of carrying on the business.

It appears in the record that settlements on the Board of Trade are frequently made by "set-off" and by "ringing off," and it was held in *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U. S. 236, where such methods were reviewed that they had all the "effects of delivery," and agáin in *Cleage v. Laidley*, 79 C. C. A. 284, 149 Fed. 346, that contracts for future delivery made with the intention of settling them by "set-off" or by "ringing off" and by the payment of differences in accordance with the rules and practice of the Board of Trade, were valid transactions.  In other words, such forms of settlement are not of themselves evidence of an agreement to settle such transactions by a payment of differences, such as is prohibited by our statute.  It was important, therefore, that the jury, which was to determine from a consideration of the entire evidence whether plaintiff participated in the intention of defendant to settle by the payment of differences only, should have had a correct guide in the determination of that matter. It was not necessary to prove that plaintiff had actual knowledge of defendant's intent; it was sufficient if it might be inferred from the character and nature of the transactions, or if the facts and attendant circumstances were sufficient to put plaintiff on notice of defendant's intention.  But, when the jury were told that in determining that question they might go beyond consideration of such matters in evidence and decide what a man of ordinary prudence ought to know, we think they were invited too near the line of

speculation for safe guidance. At best, what would be ordinary prudence in the conduct of a business like appellant's, involving hundreds of transactions with numerous customers, and all conducted under practically the same forms, whether it be the intention of the customer to gamble or not, and what he ought to know of the intention of each in each particular transaction, neither one unfamiliar with the business nor the average jury would be deemed competent to decide. The jury were given a sufficiently wide range for the determination of plaintiff's knowledge with respect to defendant's intention when they were told in another instruction that they might "take into consideration not only what was said by the parties in their communications with each other, but also all the facts and circumstances attending and surrounding the dealings between the plaintiff and the defendant as shown by the evidence; whether the defendant had acquired or expected to acquire in good faith the commodities purported to be sold by him, or whether or not he had the purpose in good faith to take the commodities purported to be bought by him, if the same should, in good faith, be delivered to him, and whether the purposes of the defendant were known to the plaintiff, and the magnitude of the transactions and the quantities of commodities bought and sold, and the manner of the settlement of the transactions, and the conduct of the parties in their dealings with each other as disclosed by the evidence, together with all other facts and circumstances in evidence in the case. We think the instruction under consideration went too far and gave the jury a test for charging plaintiff with knowledge of defendant's intention, that is not applicable to such a state of facts as are presented in this record.

As to an instruction to the effect that if any of the trades upon which plaintiff seeks recovery resulted from illegal trades known as "puts and calls" it was his duty to separate the losses resulting therefrom

from the other transactions sued on, it is enough to say that the correctness of such instruction depends principally if not entirely on whether plaintiff's testimony can be properly construed into an admission that some of the trades sued on resulted from "puts and calls." If not, the burden of proving them rested on defendant and the instruction was wrong. As a new trial must be granted on other grounds it would subserve no useful purpose to review this record as to its applicability, for if offered at a future trial its correctness must depend upon the then state of the record.

Nor is it necessary to consider the other instructions complained of, for such as may be questionable are not likely to be offered at another trial in the same form, and it would extend this decision unduly to enter into a full consideration of them.

In view of our holding, that upon errors assigned the case must be remanded for a new trial unless the cross-errors are well taken, it becomes necessary to consider the latter.

Intimately connected therewith is plaintiff's contention that he is not a broker within the meaning of the ordinance. We will first consider that question.

Like other brokers on said Board of Trade appellant made contracts in his own name, and in case of delivery received possession of the property and paid therefor, therefore, he claims that he was a factor or commission merchant and not a broker, and not required to take out a license under said ordinance. In support of his position, reference is made to the definition of the term "broker" given in *Braun v. City of Chicago,* 110 Ill. 186, where it was said that a broker is one who is engaged for others in negotiating contracts relative to property with the custody of which he has no concern, and that he is thus distinguished from a factor who sells property of others when he has its possession. But such definition must be taken in connection with the fact expressly stipulated to in that

case that the parties negotiated sales of property of which they never had possession, and, therefore, as stated in *Hately v. Kiser*, 253 Ill. 288, in referring thereto, the definition was "sufficiently accurate for that case."

But in the case of *Banta v. City of Chicago*, 172 Ill. 204, a different state of facts arose. A stockbroker, a member of the Chicago Stock Exchange, was prosecuted under a similar ordinance for failure to procure a license. The evidence disclosed that in the exercise of his duties and powers as such he received and had possession of the stock bought and sold for his customers; nevertheless, the court said that while in some respects such duties and powers pertain more nearly to the functions of factors or bankers, "they are now, and for many years have been, exercised and possessed by such brokers as well," and added: "A broker may, in the course of a transaction, exercise some of the functions of a factor or of a banker and be none the less a broker. It is believed the meaning now most usually given, in common acceptation, to the word 'broker,' is, one who transacts the business in which it appears from the stipulated facts this appellant is engaged."

In the application of this term we see no room for distinction between a broker on the Stock Exchange and one on the Board of Trade. The term is customarily applied to both, and the nature of their business justifies its use.

The transactions in question were engaged in during the years 1892 and 1893, after the decision in the *Braun* case, *supra,* and before that in the *Banta* case, *supra,* and plaintiff offered to prove that for ten years, including the period of such transactions, the city of Chicago did not enforce said ordinance against members of said Board of Trade; that on the contrary the city and its officials charged with the collection of license fees and the issuance of licenses under said ordinance construed the same and decided that members

of the Board of Trade were not brokers. The rejection of such offer is assigned as error. The contention is that the term "broker" as employed in the ordinance has a doubtful meaning, and that the proof so offered and rejected was admissible under the doctrine of contemporaneous construction. But assuming that the construction given to a city ordinance by those intrusted with its enforcement is entitled to consideration, yet it would have no weight when the language of the ordinance is clear and free from any doubt. *Jarrot v. Jarrot*, 7 Ill. (2 Gilm.) 1; *Cook County v. Healy*, 222 Ill. 310; *Whittemore v. People*, 227 Ill. 453. The ordinance expressly designates a "produce and grain broker," and defines him as one "who, for a commission or other compensation, is engaged in selling or negotiating the sale of  *   *   * produce or grain belonging to others." The definition fits accurately the transactions described in the evidence and appellant's own interpretation of them. Certainly not only is the language of the ordinance unambiguous, but the business described is precisely what appellant relies on as the basis of his action, namely, sales, etc., by appellant for a commission of appellee's produce and grain. ·

But appellant falls back on the *Braun* case, *supra*, and the definition of "broker" there given, as above cited, and says that the Court regarded the word "broker" in "this very ordinance" as open to two constructions. But a sufficient answer is that made above, that the language of the Court referred to must be interpreted with reference to the facts before it, and such was evidently the view of the Court in the *Banta* case, *supra*. What the Court says in the latter case, that a broker is none the less so because he may exercise some of the functions of a factor, was not less true when the transactions in question took place.

We think that there was no ambiguity or doubt in the language of the ordinance that would justify resort to the doctrine of contemporaneous construction,

and that the court did not err in refusing to receive evidence thereon, or in sustaining a demurrer to replications setting forth facts in relation thereto.

This brings us to the important question raised on the cross-errors whether the plea in bar of the entire action, to which a demurrer was sustained, was good. If so, then as plaintiff was not a licensed broker, the court should have directed a verdict for defendant.

That an unlicensed broker cannot recover commissions needs no discussion. It is sufficient to refer to *Douthart v. Congdon*, 197 Ill. 349, and cases there cited. But whether appellant, though unlicensed, may recover for advances made by him in transactions he negotiated on the Board of Trade for appellee presents a different question. The plea is predicated upon the claim that recovery cannot be had because it arises out of an illegal transaction, and reliance is placed upon certain general expressions found in authorities which if followed, without reference to the state of facts to which they were applied, might justify such conclusion. But when considered with reference to the facts before the court, and in connection with other authorities making a distinction between a cause of action bottomed on an illegal transaction and one merely collateral to it, they will be found inapplicable.

Appellee invokes the general rule that a "contract made in violation of a statute is void, and if the plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover" *(Miller v. Ammon*, 145 U. S. 421), and cites several cases resting upon the doctrine as stated in *Bank of U. S. v. Owens*, 2 Pet. 527, that "there can be no civil right where there can be no legal remedy, and there can be no legal remedy for that which is itself illegal." Our attention is called to various authorities using expressions like these: "The law will not lend its aid to enforce a demand having its origin in a breach of the law itself." *Ellison v. Adams Exp. Co.*, 245 Ill. 415. "The general rule is that where a statute makes a par-

ticular business unlawful, or for unlicensed persons, any contract made in such business by one not authorized is void." *Buckley v. Humason*, 50 Minn. 195, 16 L. R. A. 424." The test whether a demand connected with an illegal transaction can be enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish his cause." *Swan v. Scott*, 11 Serg. & R. (Pa.) 155; *Johnson v. Hulings*, 103 Pa. St. 498. But in cases containing such expressions it will be observed that the cause of action when not upheld was founded on the prohibited or illegal transaction itself. Many were actions by unlicensed brokers, acting in violation of statutes or ordinances, to recover commissions only. Some were actions to recover proceeds from transactions directly prohibited. The rule is quite general which prohibits recovery in such classes of cases. But while an unlicensed broker, prohibited from transacting business without a license, will not be permitted to recover compensation for his services in negotiating contracts for his customer, his right to recover for advances made thereon at his request, if the contracts themselves are not prohibited or against public policy, rests upon a different basis and a different consideration.

This has long been the rule in the English courts, and our attention has not been directed to any authorities in this country that we deem in conflict therewith. The relation in the former case is that of customer and broker and unlawful, while in the latter case it is that of principal and agent and not unlawful.

Says the Court in *Bibb v. Allen*, 149 U. S. 481, page 489: "It is settled by the weight of authority that where a principal sends an order to a broker engaged in an established market or trade, for a deal in that trade, he confers authority upon the broker to deal according to any well-established usage in such market or trade, especially when such usage is known to the principal, and is fair in itself, and does not change in any essential particular the contract between the prin-

cipal and agent, or involves no departure from the instructions of the principal; provided, the transaction for which the broker is employed is legal in its character, and does not violate any rule of law, good morals, or public policy.''

It appears from the record herein that plaintiff, in his capacity as such agent, under the usage of members of the Board of Trade, advanced and paid out money to other members thereof on defendant's trades and account.

In *Pidgeon v. Burslem,* 3 Exch. 465, page 470, a similar plea to a similar cause of action was held bad as to the whole declaration, the Court saying: ''The plaintiff's disability to act as a broker not rendering the contract void, but only disentitling him to any recompense for his services, there is no reason why he should not recover from the defendant the money he has paid at his request, express or implied. The case differs altogether from those in which the contract is forbidden, as under the acts against stock-jobbing, or where the purpose for which the money was paid was illegal.'' This was followed in *Jessopp v. Lutwyche,* 10 Exch. 611, and in *Smith v. Lindo,* 5 C. B. (N. S.) 586. In the latter case a broker on the London Stock Exchange sued to recover money paid by him on account of the defendant in the purchase of certain shares thereon. The plea set up that there was no request from defendant to pay for them ''except by implication from the usage and custom of the trade and business relating thereto,'' and that plaintiff was not licensed to act as a broker. The Court followed the *Pidgeon* case, *supra,* holding plaintiff's disability as a broker did not render the contract void; that there was no reason why he should not recover the money paid out at defendant's request, and that such usage and custom were sufficient to raise the implied request, and said: ''Such a demand made by the plaintiff under the implied authority would be good as it is not made in pursuance of any illegal con-

tract; nor does it appear to be a necessary part of the duty of a broker as such.''

The principle of liability on an implied request as above stated is laid down in *Taylor v. Stray*, 2 C. B. (N. S.) 175, and was applied to transactions on the Board of Trade, in *Perin v. Parker*, 25 Ill. App. 465, affirmed in 126 Ill. 201.

In *Armstrong v. Toler*, 11 Wheat. (U. S.) 271, Chief Justice Marshall said: ''No principle is better settled, than that no action can be maintained on a contract, the consideration of which is either wicked in itself, or prohibited by law. How far this principle is to affect subsequent or collateral contracts, the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen, and many decisions have been made.'' The learned Chief Justice then refers to the opinion of Lord Mansfield in *Faikney v. Reynous*, 4 Burr. 2069, to the effect that ''if one person apply to another to pay his debt, (whether contracted on the score of usury, or for any other purpose,) he is entitled to recover it back again,'' and says: ''This is a strong case to show that a subsequent contract, not stipulating a prohibited act, although for money advanced in satisfaction of an unlawful transaction, may be sustained in a court of justice;'' and after saying that in most of the cases cited to the court for the plaintiff in error, the suit was brought by a party to the original transaction, or on a contract so connected with it, as to be inseparable from it, and that in them and all similar cases, ''the consideration of the very contract on which the suit is brought is vicious, and the plaintiff has contributed to the illegal transaction,'' the learned Judge draws a distinction between subsequent transactions founded upon a new consideration and those bottomed on the illegal transaction itself. So, in the case at bar, money paid out by appellant at the implied request of appellee on contracts negotiated on the Board of Trade

which were not and could not be prohibited or affected by the ordinance in question, rests upon a different consideration than that of a claim for commissions, which is founded upon the contract prohibited by the ordinance.

In *Murray v. Doud & Co.*, 167 Ill. 368, it was said that conceding a broker could not, without a license, recover his commission, it did not follow that a contract consummated by him would be void, and that such a contract, though negotiated by an unlicensed broker, did not affect the right of action between the principals to it.

Under the authorities above cited, therefore, the plea was no bar to recovery for advances made in transactions on the Board of Trade at appellee's request, express or implied, whether appellant was a licensed broker or not.

For the reasons stated the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*