# R. W. Hartwig, Appellee, v. Al. V. Booth, trading as Al. V. Booth and Company, Appellant.

## Gen. No. 24,694.

1. GAMING, § 9*—*what necessary to avoid contract.* To invalidate a contract as being a gaming transaction, within the prohibition of Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733), it must be proved that neither of the parties intended to deliver the goods and that both had the intention at the time of making the contract that it would be settled on differences.

2. GAMING, § 9*—*contracts for future delivery not prohibited.* Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733), does not prohibit nor render invalid contracts for the future delivery of goods.

3. GAMING, § 41*—*what to be considered on question whether contract was a gaming transaction.* In determining whether a contract of sale is a gaming transaction within the prohibition of Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733), the court should, in considering the financial ability of the purchaser to take and pay for the goods, take into consideration the value of the goods bought and delivered.

4. BOARDS OF TRADE AND EXCHANGE, § 46*—*validity of settlements.* Settlements made on the Board of Trade by set-off and by ringing off are valid and have the effect in law of a delivery, in so far as actual transactions are there represented.

5. GAMING, § 13*—*what is test in determining whether contract is a gaming transaction.* In determining whether a transaction is a gaming transaction within the prohibition of Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733), the real question is the intention of the parties.

6. GAMING, § 9*—*what may be considered in passing on nature of contract.* In ascertaining the intention of the parties to a contract, for the purpose of determining whether the contract is a gaming transaction within the prohibition of Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733), the court is not limited to the assertion of the parties, but may also consider the nature of the transaction, the method of carrying on the business, the previous and subsequent dealings of the parties, their nature and the manner in which they were conducted, and all the attending circumstances.

7. GAMING, § 10*—*what constitutes a gaming contract.* If a contract for the sale of a commodity is with the understanding, express

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

or implied, that the transaction shall be settled by the payment of differences, it is a gambling contract and void.

8. GAMING, § 9*—*when parties to a gaming transaction particeps criminis.* If it is the purpose and intent of one of the parties to a contract for the sale of a commodity to use the legitimate forms of trading on the Board of Trade for the purpose of effecting an illegal transaction and the other party, knowing this, lends his assistance in carrying out this purpose, the parties are accomplices in crime.

9. GAMING, § 43*—*sufficiency of evidence.* In a suit to set aside a judgment on the ground that the indebtedness for which it was entered grew out of gambling transactions in grain contrary to Criminal Code, sec. 130 (Call. 1916 Stat. ¶ 3733); circumstances tending to show intentions and positive testimony to that effect are not negatived by evidence of the defendant to the effect that he entered into valid contracts with fellow members on the Board of Trade for the amounts of complainant's purchases and relying on complainant's orders, such contracts not being produced at the trial, however, and defendant admitting that he did not receive any grain upon them and that they were closed at maturity, and there being no evidence as to the intention of the parties to these contracts and the course of dealing showing that defendant was to be protected by margins put up by complainant from time to time.

BARNES, J., dissenting.

Appeal from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1918. Affirmed. Opinion filed March 9, 1920. Rehearing denied April 1, 1920. *Certiorari* denied by Supreme Court (making opinion final).

FYFFE, RYNER & DALE, for appellant.

TRAINOR & TRAINOR, for appellee.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by defendant from a decree which set aside as void a judgment obtained by the defendant in the circuit court of Cook county for the sum of $1,319.35 on the 25th of October, 1915. The appellee alleged and the decree finds that the indebtedness for

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

which said judgment was entered grew out of gambling transactions in grain contrary to the Criminal Code and was therefore void. Section 130 of that Code (Hurd's Rev. St. 1917, p. 979, Call. 1916 Stat. ¶ 3733) provides:

"Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, * * * where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof * * * shall be fined * * *, or confined in the county jail * * *, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

Other sections provide that judgments entered upon such consideration shall be void and may be set aside by a court of equity.

The decree finds in this case, as the bill alleged, that in November, 1912, the defendant was a commission broker in Chicago dealing in grains, that the complainant about that time purchased from him 10,000 bushels of wheat, paying a margin of $250 and that after the market price of wheat fell below that margin the complainant paid an additional margin of $250; that at the time of purchase nothing was said between the parties concerning the delivery of said wheat or about the financial ability of complainant or his ability to store or use that amount of wheat; that at that time the complainant was worth not to exceed $5,000; was engaged in the drug business; had no use for that quantity of wheat or any wheat and had no means of handling it if the same was received by him; that he afterwards advanced a further margin of $250 on said wheat and gave a further sum of $250 for further margins on November 21, 1912, and on February 27, 1913, complainant advanced a further margin of $300,

making a total of $1,350 paid by complainant as margins, and that when the market still further declined, complainant refused to pay further margins, and the defendant closed out said transactions; that from on or about November, 1912, until February, 1913, complainant purchased wheat from the defendant on 'at least five different occasions, and on each occasion paid a margin of two or three cents a bushel, and on each occasion said transaction was closed by settling in differences, and that in no case did the complainant purchase or the defendant sell with the expectation of making delivery of such grain at the time purchased or at any other time, but solely with the expectation of settling in differences upon the market price upon the day of purchase and the day of sale; that in the fore part of 1914 the complainant purchased 40,000 bushels of wheat and paid as a margin $300; that said transaction was conducted like the former transactions and no conversation was had between the parties as to delivery; that the complainant owned no real estate, and was worth between $4,000 and $5,000 over and above his debts, and that consisted of his business as a druggist; that neither the defendant nor any one representing him made any inquiry as to the ability of the complainant to pay for 40,000 bushels of wheat, and defendant made no inquiry as to the complainant's financial responsibility, except that upon one occasion he made inquiry of a commission broker with whom the complainant had previously traded and was informed by said broker that the complainant always paid his losses. That the defendant testified that he understood from such information that the complainant always paid the difference between what he paid for wheat and what he could get for the wheat at the time it was sold if the market went against him, and that he did not know whether or not plaintiff had access to any warehouse or elevators for storage purposes and that he was not interested in that matter;

that the said last-mentioned transaction was settled upon differences, and thereby the defendant became indebted to the complainant in approximately $1,319.39, which represented the loss incurred by the complainant and for which the judgment described was entered against him.

As conclusion from this evidence the court found that at the time of making this transaction "neither party had any intention that delivery of the grain should be made, but it was the intention of both parties that the transaction would be settled on differences alone," and further found as a conclusion therefrom that the transaction out of which the indebtedness arose was a gambling transaction and void.

The rules of law to be applied in such cases are well settled. In order to invalidate a contract under the statute it must be proved that neither of the parties intended to deliver the goods, and that both had the intention at the time of making the contract that it would be settled on differences. *Cutler v. Pardridge,* 182 Ill. App. 350. Contracts for the future delivery of goods are valid and not prohibited by the statute. *Clews v. Jamieson,* 182 U. S. 461. In considering the financial ability of the purchaser to take and pay for the goods, the value of the goods bought and delivered should be taken into consideration. *Pelouze v. Slaughter,* 241 Ill. 215. Settlements made on the Board of Trade by set-off and by ringing off, in so far as actual transactions are there represented, are valid and have the effect in law of a delivery. *Cutler v. Pardridge, supra; Board of Trade of Chicago v. Christie Grain & Stock Co.,* 198 U. S. 236; *Nash-Wright Co. v. Wright,* 156 Ill. App. 246.

The real question to be determined is the intention of the parties, which intention may be established not only by the assertion of the parties to the transaction, but from the nature of the transaction itself, the method of carrying on the business and by all the

attending circumstances. *First Nat. Bank of El Paso v. Miller,* 235 Ill. 135, p. 140. In *Jamieson v. Wallace,* 167 Ill. 388, p. 397, it is said:

"Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party, as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle the difference between the market price and the contract price."

And in the *Miller* case, *supra,* it is said:

"The question of intention is a question for the jury or the court, on a consideration of all the evidence."

And it is competent, in determining such transactions, to take into consideration the previous and subsequent dealings of the parties, the nature of them, and the manner in which they were conducted. *Gardner v. Meeker,* 169 Ill. 40. If the understanding, express or implied, is that the transaction shall be settled by the payment of differences, it is a gambling contract and void. *Pope v. Hanke,* 155 Ill. 617; *Pratt & Co. v. Ashmore,* 224 Ill. 587, p. 591; *Stewart v. Dodson,* 282 Ill. 192, p. 196. In *Pratt & Co. v. Ashmore, supra,* p. 594, it is said:

"That the grain was in the City of Chicago, and that warehouse receipts were held by plaintiffs in error, or that the rules of the Board of Trade required the actual delivery of grain, is immaterial. If it was the understanding between the seller and purchaser that the final settlement should be made between them upon differences, the transaction was a gambling one, within the meaning of section 130, *supra,* and was absolutely void."

If it is the purpose and the intent of one party to use the legitimate forms of trading on the Board of Trade for the purpose of putting over an illegal transaction, and the other party knowing this lends his assistance in carrying out the purpose, the parties are

accomplices in crime. *Weare Commission Co. v. People,* 209 Ill. 528, p. 542; *Lamson v. West,* 201 Ill. App. 251, p. 255; *Pope v. Hanke, supra,* p. 623; *Irwin v. Williar,* 110 U. S. 499.

It is suggested that the court failed to give due weight to certain evidence of defendant Booth which appears in the record, to the effect that he entered into valid contracts with fellow members on the Board of Trade for the amounts of complainant's purchases, and relying on the orders of the complainant. These contracts were not produced upon the trial, but Booth testified that his books would show them and the parties to them. He admitted that he did not receive any grain on these contracts and they were closed before maturity.

It is urged that it is unbelievable that a broker would consent to enter into contracts with other members of exchanges which required delivery and receipts of commodities dealt in, and at the same time agree with the customer that as between him and the customer he should not be required to receive the commodities purchased on his order or to deliver what was sold by him. In this case the defendant's commission on the transaction was only $60. That was all the profit he could make out of it and it is claimed that it is very improbable that for such a small profit he would enter into valid contracts for large amounts enforceable by third parties against him. There are, we think, two answers to this contention. In the first place there is no evidence in the record as to what the intentions of these third parties with whom Booth contracted were nor whether the contracts entered into with them were valid or invalid. In the second place the course of dealing shows conclusively that the plan was that Booth should be protected fully by the margins which complainant was to advance from time to time. Booth's principal duties apparently were to watch the markets and call for margins in time to make himself

safe. If we are to hold that proof of outstanding contracts of this kind negatives circumstances tending to show illegal intentions and positive testimony to that effect, the statute would be practically unenforceable. While it is true in its finding of fact the decree ignores this evidence, we do not think the evidence of sufficient weight to enable us to say that the finding of the chancellor is clearly and manifestly against the weight of it.

The decree will be affirmed.

*Affirmed.*

MR. JUSTICE GRIDLEY concurs and MR. JUSTICE BARNES dissents.

Dissenting opinion by MR. JUSTICE BARNES.

The only question involved is whether there was a mutual intent not to deliver the grain bought and sold for appellee's account but to settle on "differences." That a mutual intent must be established is not questioned. The majority opinion also recognizes that contracts for the future delivery of grain, such as were made here on the Board of Trade, are valid (*Wolcott v. Heath,* 78 Ill. 433; *Logan v. Brown,* 81 Ill. 415), and that settlement by the so-called method of "ringing up" trades made between brokers thereon has the legal effect of delivery (*Board of Trade of Chicago v. Christie Grain & Stock Co.,* 198 U. S. 236, *Cleage v. Laidley,* 79 C. C. A. 284, 149 Fed. 346; *Nash-Wright Co. v. Wright,* 156 Ill. App. 246; *Cutler v. Pardridge,* 182 Ill. App. 350), and the evidence shows that the contracts in question were of that character and were executed by such deliveries. But while the opinion recognizes the validity of contracts such as the evidence shows Booth made, and that the methods of closing them had the legal effect of delivery, yet it holds that Booth nevertheless did not intend to make deliveries but to settle on "differences." This seems much like admitting the premises and denying the conclusion. Appellee himself did not contend that

there was any express understanding that there would
be no deliveries or that the settlements were to be
made on "differences," and testified to no facts from
which alone such an understanding can be inferred.
On the contrary, he expressly testified that nothing
was said about it, and Booth expressly testified that
there was no such understanding and that he intended
and stood ready to make deliveries on his contracts.
In this he was corroborated by proof of his entering
into contracts for appellee's benefit with other mem-
bers of the Board of Trade,—the validity of which is
not impeached or even questioned,—and by executing
them in a manner conceded in said opinion to be legal
and by showing his obligations thereunder and his
financial ability to carry them out regardless of whether
appellee secured him with "margins," thus clearly
demonstrating his intention to make deliveries and not
settle on the mere "differences" of market prices.

But it is said in the opinion that Booth admitted
that he did not receive any grain on these contracts
and that they were closed before maturity. If they
were "rung up," thus making a legal delivery, no
grain had to be actually received, and the fact that
they were closed out before maturity did not make
them illegal transactions in the absence of any under-
standing that they should be so closed. There was no
proof of any such understanding. As was said in the
*Nash-Wright* case, *supra:*

"The mere fact that the client had bought with the
expectation, in case the market were favorable, of
reselling before the time of delivery should arrive and
that the broker knew this, would not render their
transaction illegal. The law does not prohibit a man
from entering into a contract for the purchase of prop-
erty to be delivered to him in the future or from order-
ing an agent to enter into such a contract, even though
he may expect under certain contingencies, to sell his
rights before maturity and to take his profit or suffer

his loss.   Such a transaction is legitimate business speculation.'' (p. 252.)

On a very similar state of facts in *Johnson v. Milmine*, 150 Ill. App. 208, the court said that it was unbelievable that the broker in that case would have consented to enter into contracts with other members of exchanges which required deliveries and receipts of commodities dealt in (as was shown by the evidence to be the facts in the case at bar), and at the same time agree with the customer that as between him and the broker he should not be required to receive commodities purchased on his order or to deliver what was sold by him.   Repudiating the reasoning in that case, the foregoing opinion says: ''In the first place there is no evidence in the record as to what the intentions of these *third parties* with whom Booth contracted were, nor whether the contracts entered into with them were valid or invalid; the second place, the course of dealing shows conclusively that the plan was that Booth should be protected fully by the margins which complainant was to advance from time to time.''   Not only were the intentions of the ''third parties'' not involved in the issues, and the validity of their contracts in no manner impeached in the record, but, in the absence of any evidence on either, the law will not presume their intentions were unlawful or their contracts invalid.   Besides complainant made no such contention and the pleadings raised no such issue, and the contracts made with them are such as the majority opinion concedes are legal.

Nor is the second conclusion tenable.   The mere fact that in the course of trade complainant put up a part of the purchase price by advances called ''margins,'' a customary method of dealing not only on the Board of Trade, but in other lines of business where the full purchase price is not due until the time of delivery, does not of itself render the transaction illegal, and no court has, to the writer's knowledge, ever so held.

As a circumstance it is perfectly consistent with a legal purchase.

The writer regards the decision in this case as out of harmony with a long line of previous decisions of this court upon a similar state of facts, including the *Johnson, Culver, Wright,* cases, *supra,* and *Kerting v. Sturtevant,* 181 Ill. App. 517, in all of which due regard was had for the applicability of the Supreme Court decisions on this subject. What was said by the court in the last cited case is particularly applicable here, namely:

"There is no evidence of any understanding and agreement between plaintiff and defendants that mere differences shall be paid *per se* without anything further being done, but each transaction was begun by an order from the plaintiff to buy or sell grain at a fixed price, and the evidence shows that actual purchases and sales were made by defendants in obedience to such orders. The plaintiff disclosed no desire or intention to gamble in grain with defendants, and it is clear from the evidence that defendants had no purpose or intention to gamble in grain with him, and that they in good faith made actual purchases and sales for him by his order." (p. 519.)

Also pertinent to the facts is the language of Mr. Justice Holmes of the United States Supreme Court, in the case of *Board of Trade of Chicago v. Christie Grain & Stock Co., supra:*

"It seems to us an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers or as 'pretended' buying or selling, without any intention of receiving and paying for the property bought, or of delivering the property sold, within the meaning of the Illinois act."

The burden of proof was on appellee to prove by a preponderance of evidence that the indebtedness for which judgment against him was obtained grew

out of gambling transactions. To hold that the burden was met by such meager evidence and circumstances as were relied on in the case at bar, is to place upon methods of doing a legitimate business through a commercial institution dealing, as is well known, not only with customers from all over this country but outside of it, such restraint as, in the language of our Supreme Court in *Wolcott v. Heath,* 78 Ill. 433, "would limit commercial transactions to such a degree as could not but be prejudicial to the best interests of trade."