James K. Riordon, Trustee et al. (Complainants), Appellants, v. William McCabe et al. (Defendants), Appellees.

William McCabe et al., Cross Complainants, v. James K. Riordon, Trustee et al., Cross Defendants.

Gen. No. 8,024.

Opinion filed August 29, 1929.

JAMES C. McMATH, BARNES & MAGOON and KIRKLAND, FLEMING, GREEN & MARTIN, for appellants; WEYMOUTH KIRKLAND, I. B. KIRKLAND and CLAUDE BROWN, of counsel.

J. L. Spaulding, for appellees.

Mr. Presiding Justice Boggs delivered the opinion of the court.

Bills were filed by appellants, Riordon, Martin & Company, members and operators on the Board of Trade at Chicago, against appellees, to foreclose two trust deeds, covering 520 acres of land in Bureau county, given by appellees to secure the payment of a note for $25,000, dated August 27, 1921, and a note for $30,000, dated October 15, 1921, both of said notes being held by appellants.

Answers were filed by appellees admitting the execution of said notes, and averring that the same were executed without any consideration, etc.; that said notes were given to secure losses on the Board of Trade, sustained by appellee William McCabe when he "gambled in grain, by making pretended purchases and sales of many million bushels of grain each year; that the complainants acted as his agents in making these pretended purchases and sales; that they were all pretended and fictitious transactions, and that the said William McCabe .. . never intended at the time of making said transactions or at any other time to make or receive delivery of said grain, and in all of which said purchases and sales the said William McCabe was gambling, and at all times continued to gamble, and at all times thereafter continued to gamble on the rise and fall of the market merely, and all of said sales and purchases at the time of the making thereof, were for the pretended delivery of the grain to some day in the future from the making of said pretended purchases and sales, and in all said transactions each one of them was settled and closed out before such delivery day arrived"; that all the bid and offer transactions were gambling, and were made with that intent; that both appellant partnership and appellee William McCabe intended and expected, as between

themselves, that there would not be a delivery or receiving of the grain sold or purchased; that in all of said transactions appellants had full knowledge that the same were carried on by said McCabe as gambling transactions, and that appellants and its members at all times were acting in all said transactions as agents and representatives of the said William McCabe.

Replications were filed to said answers. Thereafter, appellees filed a cross-bill, setting forth in substance the matters and things set forth in said answers, and alleging that the said trust deeds and the notes secured thereby were given in settlement of a balance claimed to be owing to appellants on said gambling transactions and were therefore void, and prayed that the same be canceled, etc. Answers were filed to said cross-bill, and replications to said answers.

Said causes were consolidated, and were referred to the master to take the evidence and to report the same, together with his conclusions of law and fact thereon. The evidence was taken and reported by the master, and in his conclusions he found that the transactions in question were illegal and gambling; that the notes and trust deeds were void and not collectible, and recommended the dismissal of the original bill, and that the prayer of the cross-bill for cancellation, etc., be granted. Objections filed to the report of the master were by him overruled, and it was ordered that said objections stand as exceptions in the circuit court. On the hearing, the court overruled said exceptions, and entered a decree as recommended, dismissing said original bill for want of equity, and granting the relief prayed by said cross-bill. To reverse said decree, this appeal is prosecuted.

At the time of said hearing, appellee William McCabe was some 64 years of age. He had lived practically all his life in Fairfield township, bureau county, Illinois, following the occupation of farming. He be-

gan dealing on the Board of Trade as early as 1903, and continued to do so at various times to and including the year 1923.

About 1918, appellant James K. Riordon and one Kempner were grain commission merchants, doing business as Kempner & Company, and were later succeeded by the firm of Riordon, Windsor & Company. Windsor died, and thereafter the firm was organized and did business as Riordon, Martin & Company. Appellee William McCabe dealt with all of these firms, as well as with other brokerage firms doing business on the Chicago Board of Trade.

Beginning with January, 1919, appellee William McCabe's transactions took on large proportions. Counting a purchase and sale as one transaction, appellants conducted for McCabe 1,709 distinct grain transactions. If the purchase and the sale be considered as two transactions, there were 3,418. These transactions aggregated 27,868,500 bushels of grain, at a total contract price of $31,794,208.75. These transactions might be illustrated as follows:

In 1919, there was purchased 1,090,000 bushels of May corn, at a contract price of $1,500,018.50; 1,725,000 bushels of July corn, at $2,639,883; 1,460,000 bushels of September corn, at $2,383,389.50, etc. On July 18 there was sold for appellee William McCabe 310,000 bushels of grain, at a contract price of $354,826.50. On October 2, 1920, there was sold 315,000 bushels at $403,211. On October 22, 1920, there was a purchase of 330,000 bushels at $388,722.50. Nine daily transactions made by appellants for appellee aggregated 1,850,000 bushels at a contract price of $2,271,902.50. In what was known as "bid and offer" transactions, appellants conducted for appellee William McCabe 227 separate transactions, involving 2,770,000 bushels of grain, at a contract selling price of $3,042,006.25. The record also discloses that appellee dealt in futures in

provisions through appellants on said board, aggregating a total of 1,450,000 pounds of lard and ribs, at a total contract price of $352,770.00. The evidence discloses that not a bushel of grain or a pound of provisions was ever delivered, by means of warehouse receipts or otherwise, pursuant to any of the above-mentioned transactions. Appellants never accepted delivery of any of said grain or any of said provisions, by warehouse receipts or otherwise; neither did they ever demand or request McCabe to accept or make delivery of any of said grain or provisions. All of said transactions, involving purchases and sales of grain and provisions for future delivery, were closed out by counter-purchases or sales before the delivery month, except in a very few instances. In not one of these transactions did appellee McCabe ever pay for the grain purchased, but settlements were made between McCabe and appellants on the fluctuations of the market. In all, 319 separate transactions were opened and closed on the same day, involving an aggregate of 4,775,000 bushels of grain at a contract price of $6,825,613.25. Between March 22 and October 14, 1921, the date on which appellants ceased trading for appellee, with an overdraft on their books running between $37,000 and $97,000, they purchased for his account 1,150,000 bushels of grain for future delivery, at a contract price of $1,284,687, and sold for future delivery 1,355,000 bushels, at a contract price of $1,368,712.50. As further indicative of the character and volume of the business being transacted, on March 21, 1921, William McCabe had a credit balance on his account with appellants of $35,485.62, and on March 22, the following day, his account showed an overdraft or debit of $37,235.08; a loss of $72,720.70 in the two days.

In connection with the volume of business transacted by appellants for appellee William McCabe, the

record discloses that the commissions charged by appellants against him aggregated the sum of $55,617, and that the taxes or internal revenue paid the government on his transactions aggregated $10,953.76.

Incident to the carrying on of said transactions, during the year 1920, McCabe paid to appellants, to go into his account, money, checks, drafts and certificates of deposit, aggregating the sum of $186,624.08; in 1921, $70,444.02, and in 1923, $1,200. McCabe drew out of said account in 1920, $125,048.49; in 1921, $4,333.70, and in 1923, $15,000. In addition thereto, the notes here involved were given during the year 1921.

The record also discloses that appellee William McCabe owned about 1,400 acres of farming land in Bureau county, and that at one time he had a bank account of something like $125,000; that the grain raised on his said farms was sold by him at the local grain markets, none of it being delivered on any of the trades which he was making on the Board of Trade; that he was not in the stock business or any other business requiring any large amount of grain, but was in fact a seller rather than a purchaser of grain; that he did not own storehouses or cribs for the housing of grain in excess of that needed in his farming operations; that he mortgaged one of his farms to the Mystic Workers for $60,000, which sum went into his account with appellants. The account kept between appellants and appellee shows that the transactions in question were settled on differences. The form of account sheets used by appellants has two columns, one headed "Dr. Difference" and the other "Cr. Difference," in which are recorded the profits and losses on the different transactions carried on. All moneys received by appellants for appellee, whether from profits on the sale or purchase of grain, from checks or drafts paid in by appellee, went into the same account, and all payments made by appellants on behalf of appellee,

whether to him personally, for government tax, or for margins on purchases of grain, were paid out of this account. A daily report was made by appellants, showing the state of appellee's account and the different transactions appellants were conducting for him, in futures on grain and provisions, bids and offers, etc.

It is first contended by appellants that "the facts do not support the decree."

Section 130 of the Criminal Code, Cahill's St. ch. 38, ¶ 308, provides:

"Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, where it is at the time of making such contract intended by both parties thereto that the option, whenever exercised, or the contract resulting therefrom, shall be settled, not by the receipt or delivery of such property, but by the payment only of differences in prices thereof, or whoever forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any such commodities, shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts and shall be void."

All transactions in grain are gambling, within section 130 of the Criminal Code above set out, if it was the understanding between the parties that no deliveries were to be made, but that purchases and sales were to be settled for on market fluctuations or differences. *Schneider v. Turner,* 130 Ill. 28–39; *Pope v. Hanke,* 155 Ill. 617–621; *Jamieson v. Wallace,* 167 Ill. 388–396; *Weare Commission Co. v. People,* 209 Ill. 528–639; *Bartlett v. Slusher,* 215 Ill. 348–352; *Pard-*

*ridge v. Cutler,* 168 Ill. 504–513; *Hartwig v. Booth,* 217 Ill. App. 70–74; *White v. Turner-Hudnut Co.,* 322 Ill. 133–139.

Appellee William McCabe testified that it was his intention not to receive or deliver any of the grain alleged to have been purchased or sold by appellants for him, but to settle on the fluctuations of the market. Appellants, and certain of their officers who had to do with these transactions, testified that they were carried on according to the rules of the Board of Trade, and that it was not their intention at the time the transactions were entered into to settle on the fluctuations of the market.

The intention of the parties may be established, not merely by the assertion of the parties, but by the facts and circumstances attending the transaction, including the nature and manner of carrying on the business. *Bartlett v. Slusher,* 215 Ill. 348–350; *Stewart v. Dodson,* 282 Ill. 192–196; *Hartwig v. Booth,* 217 Ill. App. 70–75; *Jamieson v. Wallace, supra,* 388; *Pope v. Hanke, supra,* 617; *Pratt & Co. v. Ashmore,* 224 Ill. 587–591; *First Nat. Bank of El Paso v. Miller,* 235 Ill. 135–140.

Among the matters and things which may be taken into consideration in determining whether or not the transactions involved were gambling transactions are: The financial ability of the dealer to handle the volume of grain dealt in (*Towne v. Buckley,* 230 Ill. App. 573–580; *Jamieson v. Wallace, supra,* 388); the facilities for handling the grain purchased (*Towne v. Buckley, supra,* 473); the use or lack of use of such grain or commodities (*Weare Commission Co. v. People, supra,* 546); the way in which previous transactions have been carried on and closed (*Jamieson v. Wallace, supra,* 386; *Hartwig v. Booth, supra,* 75; *Pratt & Co. v. Ashmore,* 224 Ill. 587–593; *First Nat. Bank of El Paso v. Miller, supra,* 142; *Campbell v. McCorrell,* 214 Ill.

App. 342–346; *Lampson v. West,* 201 Ill. App. 251–257); the knowledge of the broker as to the financial ability, facilities for handling the grain, etc., and as to how former transactions had been closed (*Towne v. Buckley, supra,* 580; *Hartwig v. Booth, supra,* 74; *Easton Farmers Grain Co. v. Fernandes Grain Co.,* 229 Ill. App. 102–107); the fact, if it be a fact, that in the closing of said transactions no grain had been delivered, but that the profits and losses were adjusted by way of differences in the market price and the contract or option price of the grain (*Bartlett v. Slusher, supra,* 348; *Easton Farmers Grain Co. v. Fernandes Grain Co., supra,* 107.)

On the question of appellants' knowledge of the financial condition of appellee William McCabe, it should be observed that the mortgage of $60,000 to the Mystic Workers of the World was made by appellees in 1921, at the urgent request of appellants, in order to take care of the overdraft of appellee William McCabe; that appellants took an active part in closing said transaction, and charged appellee for their services, expenses, etc., in connection therewith $938.25. The total amount of this loan, after the expenses were deducted, was passed by appellants to the credit of appellee William McCabe on their books.

From the facts and circumstances in the record, under the authorities above set forth, no other conclusion is warranted than that appellants had full knowledge of appellee's financial ability, his facilities for handling the grain in question, and the manner in which other deals had been handled and had been settled for his account.

Counsel for appellants contend that appellee's ability to have borrowed money on warehouse receipts would have enabled him to have carried into effect the transactions in which he was involved. This conclusion is not warranted by the record. Even though it

be conceded that appellants' intention was to carry into effect said transactions, the evidence, beyond any reasonable doubt, discloses that appellee's intention was not so to carry them out, but was to gamble, and that intention was well known to appellants. That being true, if appellants aided appellee in so gambling on the Board of Trade, through them as brokers, they would be *particeps criminis,* and could not recover against appellees. ·

In discussing a question of like character, the supreme court in *Weare Commission Co. v. People, supra,* at page 540 says:

"When the plaintiff in error bought the grain for Kruse upon the mere deposit of a margin, and without the payment of the whole of the purchase money, and when it, under the direction of Kruse, sold the grain before the time of delivery arrived, it certainly knew that there was a mere speculation on the part of Kruse in differences. Flower was certainly aware of the fact that Kruse, instead of waiting until the time of delivery should arrive, was selling out before such time of delivery, because the sale was made through plaintiff in error itself or Flower its agent. Parties are always presumed to intend the natural consequences of their acts. When Kruse gave the order for the purchase of the grain, and made his deposit, and then, as soon as there was a rise in the market price, sold out the grain, the presumption is that he intended, when he first made the purchase, to sell out as soon as there was a rise. And when the plaintiff in error, or its agent, aided him in the transaction, and helped him to carry out the transaction in this illegal way, it is idle to say that the plaintiff in error did not know what the intention of Kruse was. . . . 'The question of intention is a question for the jury or for the court, to be determined by a consideration of all the evidence. . . . The intention of the parties in such cases may

be determined from the nature of the transaction and from the manner and method of carrying on the business. . . . An examination of the authorities . . . will show that the intention of the parties may be determined from a variety of circumstances. Among these circumstances, besides the mode of dealing between the parties, is the pecuniary ability of the party purchasing. If the purchases of a party, as ordered through a broker, are larger in amount than he is able to pay for, it is a strong circumstance indicating that there was no intention of receiving the property, but rather an intention to settle the difference between the market price and the contract price. Such intention may be also inferred where the party making the purchase never calls upon the party, ordering the purchase, for the purchase money, but only for margins. It makes no difference whether the real intention is formally expressed in words or not, if the facts and circumstances in proof show, that it was the real understanding, that there should be no actual purchase and no delivery or acceptance of the property involved in the contract, but merely an adjustment of damages upon differences.' (*Jamieson v. Wallace, supra.*)''

Counsel for appellants contended on the oral argument that appellee had his own broker, and that by reason thereof the defense here sought to be made could not be maintained. This point is not well taken. The evidence shows that, while in many of said transactions McCabe gave his order directly to an independent broker to execute, the broker would make a memorandum showing such purchase or sale to have been made by the name of appellants with some other member of the Board for McCabe's account, which card would be turned in to the office of appellants, and the transaction carried out by them. The commissions of such broker were paid by appellants. Appellants cannot relieve themselves of responsibility upon the

ground that they acted merely as an agent for their customer in these transactions. *Pearce v. Foote,* 113 Ill. 228–238; *Weare Commission Co. v. People, supra,* 542. In the latter case, the court says:

"There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or, indeed, in the doing of any unlawful act. All persons actively participating are principals. 'If parties to speculative dealings intend merely to gamble in the rise and fall of prices, and the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is *particeps criminis.*' (8 Am. & Eng. Ency. of Law,— 1st ed.—pp. 1011, 1012.)"

Counsel for appellants insist that, in determining this cause, weight should be given to the rules of the Board of Trade. In view of the character of the transactions involved, under the holdings of the Supreme and Appellate Courts, the rules of the board have no place in the determination of the issues as between appellants and McCabe. *Pardridge v. Cutler, supra,* 510; *Weare Commission Co. v. People, supra,* 543; *White v. Turner-Hudnut Co., supra,* 140. In *Easton Farmers Grain Co. v. Fernandes Grain Co., supra,* the court at page 105 says:

"If a contract be made contrary to law, it matters not whether it be made upon the Chicago Board of Trade or elsewhere. In *Pardridge v. Cutler, supra,* it was said: 'It is not claimed that all dealings on the Board of Trade are gambling transactions while, perhaps, no one will deny that a part of the business transacted there is of that character. Plaintiff might have made *bona fide* purchases and sales for actual receipt and delivery in every instance, but the forms adopted could be used with equal facility, by counter purchases and sales and settlement of differences, for illegal and illegitimate dealings as between him and defendant.

. . . No one can be found to deny that parties can gamble in differences under these rules as easily as to do a legitimate business, and it was wholly immaterial that the rules provided for legitimate methods.' ''

Under the authorities above cited, the transactions involved herein were gambling transactions, so understood by appellants as well as by McCabe. Even conceding that this is not true, the evidence discloses beyond peradventure that appellee McCabe was intending by said transactions to gamble, through appellants as his brokers, and that that fact was well known to appellants. That being true, if they assisted him, even under the rules of the board, in carrying on his gambling transactions, they are *particeps criminis*, and, being such, cannot recover.

It may be further observed that, appellants having received from appellee large sums of money in checks, deposits, proceeds of mortgage, etc., they, under the holding of the Supreme Court, are to be regarded as ''winners'' within the meaning of that word as employed in section 132 of the Criminal Code, Cahill's St. ch. 38, ¶ 310. *Kruse v. Kennett*, 181 Ill. 199–205; *Pelouze v. Slaughter*, 241 Ill. 215–227; *Moench v. Graff*, 212 Ill. App. 42–47; *Jamieson v. Wallace, supra,* 400; *Pearce v. Foote, supra,* 237–238.

None of the funds paid in by appellee to appellants were applied on the purchase of any grain or provisions, and it was not intended they should be so applied. They were intended to be and were applied in settlement of losses on transactions carried on by appellants for appellee, and for the purpose of protecting appellants from losses on future transactions. Under the above authorities, appellants fall under the designation of winners. This is true, even though the evidence also discloses that the amounts paid in by appellee were applied by appellants in payment of losses, etc., resulting to them from transactions on behalf of appellee.

In *Kruse v. Kennett, supra,* the court at page 205 says:

"It is forcibly and vigorously urged the 'remedies' provided by section 132, by the express terms of the section, are to be enforced only against one who was 'winner' in the transaction, and that the defendants (appellees) herein were but the brokers or commission merchants engaged by Savage to conduct the negotiations. . . . That contention cannot be regarded as an open one in this court. We held in *Pearce v. Foote, supra,* and *Jamieson v. Wallace, supra,* that if one acting as broker or commission man for another in the purchase of grain or stocks, under contracts which are gambling contracts under section 130, receive from such other money or property to be used, and which is used, in the payment of losses incurred in the transaction, the broker or commission man is a 'winner,' within the meaning of that word as employed in the statute in question. . . . It is clear they won such sums so paid to them by Savage, and the fact they lost the same sums to other parties does not make them any the less 'winners.'"

Appellees insisted that the assignment of errors is not sufficient to bring before this court the merits of the case. While the assignment of errors is not as specific as it should be, we have deemed best to consider the case on the merits.

Under the facts and circumstances disclosed by the record, none of the contentions made by appellants for a reversal of said cause are well taken. The decree of the circuit court is therefore affirmed.

*Decree affirmed.*